# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-3554

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Nebraska |
| Harold Fox,  also known as Rich, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted:  May 13, 2004
Filed: January 31, 2005

_____

Before LOKEN, Chief Judge, SMITH, Circuit Judge, and DORR,[1] District Judge.

_____

DORR, District Judge.

Harold Fox was charged in the United States District Court for the District of Nebraska with conspiracy to distribute 500 grams or more of methamphetamine and use of a firearm during or in relation to a drug trafficking crime.  A jury convicted Fox on both counts and the district court[2] sentenced Fox to 168 months of

_____

[1]The Honorable Richard E. Dorr, United States District Judge for the Western District of Missouri, sitting by designation.

[2]The Honorable Thomas M. Shanahan, United States District Judge for the District of Nebraska.

imprisonment on Count I and 60 months of imprisonment on Count II, to run consecutively. Fox appeals his conviction, arguing that the district court abused its discretion and violated his Sixth Amendment right to confrontation. For the reasons discussed below, we affirm Fox's conviction. Fox has also challenged his sentence based on the recent decision in *Blakely v. Washington*, --- U.S. ----, 124 S. Ct. 2531, --- L. Ed. 2d ---- (2004). We remand Fox's sentence to the district court for further consideration in light of *Blakely*.

## I. Background

On October 21, 2002, a two-count Indictment was filed in the United States District Court for the District of Nebraska charging Harold Fox with one count of conspiracy to distribute 500 grams or more of methamphetamine from December 1, 2001, up to and including August 23, 2002. The second count of the Indictment charged Fox with using a firearm during or in relation to a drug trafficking crime. Fox entered a plea of not guilty to the Indictment.

On May 19, 2003, the matter proceeded to a jury trial. During trial, ten witnesses testified in the government's case about Fox's receipt and distribution of methamphetamine during the time frame of the conspiracy. Six of these individuals – Tristan Carter, Timothy Noer, Jennifer Osborn, Ray Snover, Michael Karas, and Angel Arroyo – were cooperating witnesses. At the time of trial, several of the cooperating witnesses had already pled guilty and had been sentenced in connection with their involvement in the conspiracy. Carter had pled guilty to conspiring to distribute methamphetamine and use of a weapon and had been sentenced to 248 months of imprisonment. Karas had pled guilty to the same charges and was awaiting sentencing. Arroyo, Snover, and Noer had pled guilty to conspiracy to distribute methamphetamine. Arroyo had been sentenced to 138 months of imprisonment, Snover had been sentenced to nine years of imprisonment, and Noer was awaiting

sentencing. The cooperating plea agreements of all of these individuals were received into evidence at trial.

Tristan Carter, a cooperating witness, testified at Fox's trial. Carter testified that he had been distributing methamphetamine in Omaha, Nebraska, from approximately January of 2002 until his arrest pursuant to a federal indictment on August 23, 2002.

On March 31, 2002, Carter and Fox were arrested in Kansas. An officer with the Nemaha County Kansas Sheriff's Department stopped a 1991 Mitsubishi driven by Harold Fox and occupied by Tristan Carter and a female. During the search of the vehicle, officers recovered .18 grams of methamphetamine, digital scales, a razor blade, and a propane torch. Officers searched Carter and found a sunglasses case containing 27.12 grams of methamphetamine. Carter testified that the methamphetamine found in the sunglasses case was his and the remainder of the methamphetamine belonged to Fox, although he had supplied it to Fox.

Carter described himself as Fox's "somewhat" partner in the distribution of methamphetamine. Carter and Fox were also both users of methamphetamine. Carter said that he and Fox pooled their money on two occasions to buy methamphetamine from Tim Noer. After their second combined purchase, Carter began purchasing methamphetamine from Noer and others on his own. Over the next several months, Carter purchased approximately 130 pounds of methamphetamine. Fox was one of Carter's customers. Initially, Carter sold Fox 8-ball amounts, increasing to one ounce amounts. Carter estimated that he sold Fox methamphetamine on fifty to 100 occasions. He estimated the total quantity of methamphetamine that he sold to Fox was around four to five pounds.

Carter testified that Fox was reselling at least some of the methamphetamine he received from Carter. Carter said that he went with Fox several times when Fox

sold methamphetamine. Carter also testified that Fox carried a gun during some of the drug deals he had with him. Carter testified that Fox traded a .357 handgun and a .25 handgun to him for methamphetamine and to pay off some of his debt to Carter.

On cross-examination, Carter testified that Jennifer Osborn was a friend of his and that he worked with her. He stated that Osborn knew about his drug deals and that he told her that he would kill her nephew if she ever talked to the police about what he was doing. Carter stated that he understood he would get some percentage reduction of his sentence for cooperating, but that he had no idea how much. He said that he had no understanding that his threat to Osborn could affect his sentence.

Following Carter's testimony, the jury heard testimony from other co-conspirators regarding Carter's dealings with Fox, as well as Fox's individual dealings. Tim Noer testified that Fox was with Carter when Carter received one-quarter pound of methamphetamine from Noer in Grand Island, Nebraska. Later on, Carter and Fox pooled their money to make another purchase of methamphetamine from Noer in Grand Island.

Noer testified that he saw Fox at Carter's residence two or three times. Noer stated that on one occasion Fox wanted to trade a .357 handgun to him for an ounce of methamphetamine. Fox later traded the .357 handgun to Carter for an ounce of methamphetamine. Noer said that he saw Fox with the .357 handgun three times before he traded it to Carter. Noer testified that he hoped to get his sentence reduced by cooperating and that he believed the reduction would be approximately fifty percent based on what he had read in the law library and heard from other people.

Jennifer Osborn testified under a non-prosecution agreement and said that she met Carter in July of 2001. She said that she was aware of Carter's drug dealing and that she would count the money Carter received from the sale of methamphetamine. Osborn testified that she saw Fox receive methamphetamine from Carter at Carter's

-4-

residence at least thirty to forty times for a total of about one-half pound. She was also present on one occasion when Fox gave methamphetamine to his sister. Osborn said that she saw Fox with a handgun in the small of his back one time when he was at Carter's house for a drug transaction.

Ray Snover, Angel Arroyo, and Michael Karas all testified that they witnessed Carter deliver methamphetamine to Fox. Snover said that he saw Fox carrying a gun during one of these drug deals. Arroyo testified that he purchased methamphetamine from Fox between seven and ten times for a total of one-quarter pound and that he sold Fox a total of one-half pound of methamphetamine. Karas testified that he saw Fox receive methamphetamine from Carter and that he saw Fox trade the .357 handgun to Carter for methamphetamine.

During cross-examination, Karas was questioned about his plea agreement, the possible sentence he was facing, and the possible percentage reduction he was hoping to receive for testifying. Karas testified that he was facing a minimum 15-year sentence and that he had heard talk in the jail that a fifty percent reduction was possible for testifying.

On May 21, 2003, the jury found Fox guilty on both counts, and specifically found that Fox was responsible for at least fifty grams of methamphetamine but less than 500 grams of methamphetamine. During the sentencing hearing, the district court enhanced the guideline sentence based on the court's finding that 1.814 kilograms of methamphetamine were attributable to Fox. As a result, the district court sentenced Fox to 168 months of imprisonment on Count I and 60 months of imprisonment on Count II, to run consecutively.

## II. Discussion

*A. Carter's Testimony*

Fox argues that the district court abused its discretion and violated his Sixth Amendment confrontation right by sua sponte asserting the attorney-client privilege on Carter's behalf. Fox contends that he was not allowed to fully cross-examine Carter regarding the benefits he had already received for his cooperation and further benefits he hoped to receive for testifying against Fox.

During cross-examination, Fox's counsel attempted to ask Carter about conversations he had with his attorney regarding the nature of his plea agreement and the potential sentence he could receive. Counsel stated it was his intent, "to talk to him about what his attorney told him about what the potential sentence is." The district court refused to allow defense counsel to inquire about communications between Carter and his attorney on the basis that such communications were privileged and confidential and that if Carter's attorney had been in court "as he was supposed to be" he would be asserting the privilege. However, the district court did allow Fox's counsel to inquire about what Carter's knowledge and understanding of his potential sentence and the guidelines was following his discussions of these issues with his attorney.

Defense counsel also inquired of Carter about the extent of departure a cooperating witness usually obtains for testifying. The government objected based on relevancy and the district court sustained the objection. Later, however, Carter testified that he understood that he would get some percentage reduction if he cooperated, but that he had no idea how much.

Generally, the attorney-client privilege is personal and cannot be asserted by anyone other than the client. *See United States v. Hatcher*, 323 F.3d 666, 674 n.2 (8th

Cir. 2003) (citing *United States v. Fortna*, 796 F.2d 724, 732 (5th Cir. 1986), *cited with approval in United States v. Escobar*, 50 F.3d 1414, 1422 (8th Cir. 1995)).  In this case, the district court sua sponte asserted the attorney-client privilege on behalf of Carter.  Regardless of the appropriateness of the district court's assertion of the privilege, the question is whether the district court's limitation of defense counsel's cross-examination of Carter, resulted in a violation of the Confrontation Clause.  Fox argues that he was not allowed to fully cross-examine Carter regarding the benefits he had already received for his cooperation and the additional benefits he hoped to receive for testifying.  Fox suggests that he should have been able to explore whether Carter's attorney informed him of the customary reduction received for testifying against other parties.

A Confrontation Clause violation is shown when a defendant demonstrates that a reasonable jury might have received a significantly different impression of a witness's credibility had counsel been permitted to pursue the proposed line of cross-examination.  *Harrington v. Iowa*, 109 F.3d 1275, 1277 (8th Cir. 1997).  A trial court's decision to limit cross-examination will not be reversed unless there has been a clear abuse of discretion and a showing of prejudice to the defendant.  *United States v. Brown*, 110 F.3d 605, 611 (8th Cir. 1997).  The focus of the prejudice inquiry in determining whether the confrontation right has been violated is on the particular witness, not on the outcome of the trial as a whole.  *Delaware v. Van Arsdall*, 475 U.S. 673, 690, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986).

In the event that there is a violation of the Confrontation Clause, the Court must consider whether the constitutional error was harmless beyond a reasonable doubt.  *Van Arsdall*, 475 U.S. at 681, 684.  "The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt."  *Id.* at 684.  In assessing whether the error was harmless, the Court must consider "the importance of the witness' testimony in the prosecution's case, whether the testimony

-7-

was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Id.* at 684; *see also United States v. Caldwell*, 88 F.3d 522, 525 (8th Cir. 1996).

The record demonstrates that Fox's counsel engaged in a lengthy cross-examination of Carter. The district court permitted Fox's counsel to ask Carter about his understanding, after discussions with his attorney, about his potential sentence, the sentencing guidelines, and the benefits he would receive for cooperating. Fox's counsel also went through the applicable sentencing guidelines with Carter in detail. Carter testified that he understood that he would get some percentage off of his sentence for cooperating, but that he had no idea how much.

Further, defense counsel was able to question other cooperating witnesses about the percentage of sentence reduction typically expected for cooperating. Michael Karas, another cooperating witness, testified that there were "rumors" that a cooperating witness would receive a fifty percent reduction of their sentence for cooperating. In addition, Tim Noer testified that he believed, based on what he had read in the law library and heard from other people, that the reduction for cooperating would be approximately fifty percent. Regardless of the source of the information, Fox was able to put before the jury evidence that there could be a fifty percent reduction in sentence for cooperating. Fox's counsel specifically argued to the jury in regard to all the cooperating witnesses that "what they're really angling for is a 50 percent reduction in their sentences."

Based on the evidence of record, we conclude that Fox has not shown that a reasonable jury might have had a *significantly* different impression of Carter, his credibility, or his motivation for testifying had defense counsel been able to pursue the proposed line of questioning regarding Carter's conversations with his attorney. Clearly, there was substantial evidence before the jury regarding Carter's situation,

the sentence he received, his credibility, his motivations for testifying against Fox, the fact that he hoped to receive a benefit for testifying against Fox, and the possibility that a sentence could be reduced by fifty percent for cooperation. To allow defense counsel to inquire about the substance of Carter's conversations with his counsel and to put such evidence before the jury would not have resulted in the jury having a significantly different impression of Carter than they already had. Therefore, there has been no showing of prejudice to Fox as a result of the limitation that was placed on defense counsel's cross-examination of Carter. *See Brown*, 110 F.3d at 611.

## B. Carter's Presentence Investigation Report

Fox argues that Carter was the government's main cooperating witness and, although he threatened Osborn, he received a sentencing benefit in that he was not assessed an enhancement for obstruction of justice based on the threat. Additionally, Fox argues that the district court erred in failing to order the government to provide defense counsel with a copy of Carter's presentence investigation report. Fox contends that the presentence investigation report is discoverable under *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-97, 10 L. Ed. 2d 215 (1963), because it contains exculpatory evidence of a benefit conferred upon Carter by the absence of any mention of the threat to Osborn which, Fox argues, resulted in no enhancement of Carter's sentence for obstruction of justice. Fox argues that he had a right to explore whether Carter knew of this benefit and to show the jury, if Carter denied knowledge, that the benefit was conferred.

Fox's counsel requested that the government be required to provide him with a copy of Carter's presentence investigation report and divulge any conversations with Carter's attorney regarding the prosecution version that was submitted to probation. Defense counsel also suggested that there was an agreement between the prosecutor and Carter's attorney regarding the threat to Osborn.

The district court requested that the government disclose any conversations with Carter's attorney regarding the threat to Osborn or the prosecution version of the offense. The district court also ordered the government to disclose any communications, correspondence, or notes regarding any such conversations. The prosecutor stated on the record that there was no agreement with Carter's attorney as to the Osborn threat and disclosed one piece of correspondence from Carter's attorney pertaining to the plea agreement, which requested that Carter be allowed to plead to an ordinary firearm count rather than the brandishing count. The prosecutor advised that there was nothing else in the prosecution file with respect to Carter's plea, offer, plea negotiation, or sentencing.

The district court reviewed the presentence investigation report in camera and found that it did not contain any mention of an obstruction of justice or the Osborn threat. The district court concluded that the presentence investigation report was not discoverable because it was not a statement of an accused or witness and was a confidential court document. Further, the district court found that the presentence investigation report was not discoverable because it did not contain any exculpatory evidence, material, or information which Fox would be entitled to under *Brady*.

To prove a *Brady* violation, a defendant must show that the prosecution suppressed evidence that was favorable to the accused and that the evidence was material to the issue of guilt or punishment. *United States v. Duke*, 50 F.3d 571, 577 (8th Cir. 1995) (citing *Prewitt v. Goeke*, 978 F.2d 1073, 1078 (8th Cir. 1992)). Evidence is material if there is a reasonable probability that the disclosure of such evidence would have led to a different result at trial. *Duke*, 50 F.3d at 577.

Fox's attorney questioned Carter during cross-examination about whether he had an understanding that his threat to Osborn would have any consequence on his sentencing. Later, counsel asked if Carter understood that the probation office, during their presentence investigation, "may find that you obstructed justice because

-10-

of your incident with Ms. Osborn." Carter's answer to both questions was "no." At the time of his testimony, the presentence investigation was completed and Carter had already been sentenced. It was only after Fox's counsel had rested his cross-examination of Carter and Carter was excused as a witness that counsel requested the trial court to compel the government to provide defendant with a copy of Carter's presentence investigation report. It is clear from the record that the presentence investigation report made no mention of the threat, any sentence enhancement for obstruction of justice, or any benefit conferred on Carter in relation to the threat. Therefore, the report itself would have added nothing in terms of additional evidence. Further, Fox's counsel questioned Carter about his understanding of whether or not he got a sentencing benefit related to the threat and the possible obstruction of justice enhancement. Therefore, there was nothing about the lack of information in the report that would have raised a reasonable probability that disclosure of the report would have led to a different result at trial. We conclude there was no *Brady* violation in regard to the government's decision to not produce a copy of Carter's presentence investigation report to defendant's counsel.

## C. Impeachment of Carter for Bias

Fox also argues that the district court's alleged errors, individually or in combination, served to deny him of a full opportunity to impeach Carter for bias. The Court recognizes the importance of a defendant's opportunity to impeach a witness for bias. However, even if we assume that the district court erred as Fox has suggested, when we consider the factors relevant to the determination of whether such error is harmless we conclude that any such error by the district court was harmless beyond a reasonable doubt.

Clearly, Carter's testimony was important to the prosecution's case. He gave extensive testimony regarding his own purchases and sales of methamphetamine and his interaction with Fox in the acquisition and distribution of methamphetamine.

However, he was not the only witness to testify about Fox's activities. Carter was one of six cooperating witnesses who testified. Angel Arroyo, Ray Snover, Timothy Noer, Jennifer Osborn, and Michael Karas also testified about Fox's activities regarding the purchase and sale of methamphetamine, and his dealings with Carter. A number of these witnesses testified that they observed Fox receive methamphetamine from Carter. Several of the cooperating witnesses saw Fox carry a firearm during drug deals, and Michael Karas testified that he was present when Fox traded the .357 handgun to Carter for methamphetamine. In addition, the district court allowed extensive cross-examination of Carter regarding his understanding or knowledge of his sentence and the benefits he hoped to receive through his cooperation, which clearly demonstrated Carter's motivation for testifying. Even if additional evidence regarding Carter's bias or motivation for testifying against Fox had come in it would, at best, have been cumulative and would not have changed the result because the government's case against Fox was overwhelming.

In light of the evidence of record, and our consideration of the foregoing factors, we conclude that any error by the district court on these issues was clearly harmless beyond a reasonable doubt.

*D. Sentencing Arguments*

Finally, Fox filed a supplemental *pro se* brief raising two points of error in regard to his sentence. First, Fox's *pro se* brief argues that the district court erred in the calculation of his criminal history category, and thereby his sentence, by including one point for a California conviction in 1999. Fox's argument regarding this matter was appropriately and exhaustively addressed by the district court. In fact, the district court adjusted Fox's criminal history category downward based upon the court's finding that there was an overstatement of his criminal history. This adjustment effectively negated this issue. Therefore, we find that Fox's argument on this point

is without merit.  Second, Fox's *pro se* brief argues that the district court erred when it failed to sentence him based upon the maximum sentence authorized by the jury verdict, which substantially limited the amount of drugs attributed to him.

In this case, the jury made a specific finding that Fox was responsible for at least 50 grams of methamphetamine, but less than 500 grams of methamphetamine. The presentence investigation report recommended that Fox be found responsible for 1.814 kilograms of methamphetamine. Fox filed an objection to this recommendation and argued the objection during the sentencing hearing before the district court. However, the district court overruled Fox's objection on this issue and found, based on a preponderance of evidence, that 1.814 kilograms of methamphetamine were attributable to Fox.  This resulted in a significant enhancement to the applicable guideline range utilized by the trial court in assessing its sentence.

Oral argument in this matter was heard on May 13, 2004.  Thereafter, the United States Supreme Court issued its decisions in *Blakely v. Washington*, -- U.S. --, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004) and *United States v. Booker*, – U.S. –, 2005 WL 50108 (Jan. 12, 2005).  Fox has preserved this sentencing issue, and, pursuant to *Booker*, is entitled to a new sentencing proceeding.  *See id.* 2005 WL 50108 at *29 (Breyer, J. for the court) (noting that *Booker* applies to all cases on direct review).  We remand for resentencing in accordance with *Booker*.

### III.  Conclusion

In summary, we conclude that Fox is not entitled to prevail on any of his arguments that the district court erred during trial as to the assertion of the attorney-client privilege, cross-examination of Carter, or disclosure of Carter's presentence investigation report.  As previously stated, there has been no showing of prejudice to

Fox based on the district court's actions and any error by the district court was clearly harmless beyond a reasonable doubt. Accordingly, Fox's conviction is affirmed.

However, we remand for resentencing in accordance with *Booker*.

_____