UNITED STATES of America, Appellee,

v.

Rady I. SDOULAM, also known as Rady I. Sduolam, also known as Roddy Ibrahim, also known as Rady A. Sdoulam, Appellant.

No. 03–3946.

United States Court of Appeals, Eighth Circuit.

Submitted: Sept. 13, 2004.

Filed: March 2, 2005.

Counsel who presented argument on behalf of the appellant was James R. Wyrsch of Kansas City, MO. J. Justin Johnston of Kansas City appeared on the brief.

Counsel who presented argument on behalf of the appellee was Charles E. Ambrose, Jr., AUSA, of Kansas City, MO.

Before BYE, BOWMAN, and SMITH, Circuit Judges.

BOWMAN, Circuit Judge.

Rady I. Sdoulam was charged with conspiracy to distribute pseudoephedrine, then having reason to believe that such chemical would be used to manufacture methamphetamine in violation of 21 U.S.C. §§ 841(c)(2) and 846, and with distribution of pseudoephedrine, then having reason to believe that such chemical would be used to manufacture methamphetamine in violation of 21 U.S.C. § 841(c)(2). A jury convicted Sdoulam of both of the charged offenses, and the District Court[1] sen-

---

1. The Honorable Gary A. Fenner, United States District Judge for the Eastern District of Missouri.

tenced Sdoulam to 108 months' imprisonment. Sdoulam now appeals both his convictions and his sentence. In challenging his convictions, Sdoulam asserts that the District Court erred in: (1) denying Sdoulam's motion to dismiss and motion for acquittal or a new trial on Count One of the indictment on the ground that Count One allegedly charged Sdoulam with conspiring to commit a negligent act, (2) admitting expert testimony of probability of guilt, (3) denying Sdoulam's motions for acquittal or a new trial on the ground that there is a variance between the conspiracy charged in the indictment and the evidence presented at trial, and (4) instructing the jury on "deliberate ignorance" and "permissive inference." For the reasons discussed below, we affirm Sdoulam's convictions. In challenging his sentence, Sdoulam argues that his Sixth Amendment rights were violated because the sentence was premised on facts found by the District Court, rather than the jury. Given the Supreme Court's recent decision in *United States v. Booker,* —— U.S. ——, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), we remand for resentencing.

I.

Sdoulam is a lawful resident alien from Israel who has lived in the United States since 1996. While Sdoulam does not read or write English, he is proficient in spoken English.[2] In 1997, Sdoulam and a partner, Eiad Mousallet, purchased a Quick Stop convenience store in Kansas City, Kansas. The co-owners shared the operating duties of the store. In addition, Mousallet owned and operated a Quick Stop store in Grandview, Missouri.

The Federal Bureau of Investigation (FBI) began investigating the Quick Stop stores after the FBI received a tip from a former employee of the Kansas store that large quantities of pseudoephedrine products were being sold out of the store. Darlene Babcock reported that she had worked in the Kansas store in 1997 as a cashier and shelfstocker. During her employment, several wholesale venders brought products containing pseudoephedrine to the store. Sdoulam and Mousallet—whichever was on duty—would pay for the products with cash from their pockets, rather than follow the usual procedure of purchasing inventory with funds from the cash register. According to Babcock, Sdoulam and Mousallet generally stored pseudoephedrine products behind the counter rather than on the main sales floor. Babcock introduced Sdoulam and Mousallet to several methamphetamine manufacturers, or "cooks," who then came to the store and purchased large quantities of pseudoephedrine. Trial Tr. at 147. When both Sdoulam and Mousallet were present at the time that a cook came to buy pseudoephedrine, Sdoulam and Mousallet split the money from the sale. Babcock testified at trial that she was addicted to methamphetamine while employed at the Quick Stop and that she had multiple conversations with Sdoulam about methamphetamine during that time.

At the FBI's request, Babcock agreed to become a paid informant and to aid in the investigation of the Quick Stop stores. After making some preliminary telephone contacts with Sdoulam, Babcock went to the Kansas store on November 27, 2001. Babcock told Sdoulam that she knew someone who might like to purchase pseudoephedrine. Sdoulam gave her a box containing pseudoephedrine in sixty-milligram tablets and told her to show it to her friend as a sample of what Sdoulam could

---

**2.** Although Sdoulam testified through an interpreter at trial, he has passed the spoken English portion of the citizenship test administered by the United States Immigration and Naturalization Service and was heard speaking English on audio tapes played at trial.

provide. On December 1, 2001, Babcock told Sdoulam that her friend was interested in purchasing pseudoephedrine products, but that he wanted to purchase in large quantities because "that stuff he does, you know, the meth, that takes a lot of those boxes to make that up." Trial Tr. at 301. On December 5, 2001, Babcock went to the Kansas store to purchase pseudoephedrine products, but, despite searching through boxes in the back room, Sdoulam was unable to find any pseudoephedrine to sell. On December 10, 2001, however, Sdoulam sold Babcock boxes of various cold medicines containing pseudoephedrine for $500.00 in cash.

In January 2002, undercover agent Jay Oliver began accompanying Babcock to the Kansas store. On January 18, 2002, Sdoulam sold Oliver forty-seven boxes of nasal decongestant containing pseudoephedrine. Oliver asked Sdoulam if, in the future, he could obtain sixty-milligram tablets, rather than thirty-milligram tablets, explaining that it "[t]akes too many [thirty-milligram tablets] to cook." Trial Tr. at 709. On February 8, 2002, Oliver returned to the Kansas store. Sdoulam offered to sell him sixty boxes of pseudoephedrine products from behind the front counter. These boxes contained thirty-milligram tablets, and Oliver again told Sdoulam that he would rather purchase sixty-milligram tablets. Sdoulam went to his minivan in the store parking lot and retrieved a brown bag containing blister packs of sixty-milligram pseudoephedrine tablets, which had been removed from their original retail packaging and had no instructions for consumer use. Oliver paid Sdoulam $500.00 for fifty-two of the blister packs. In negotiating the price, Sdoulam noted that he had to "split [the money] with my buddy." Id. at 694–95; Exh. 60. Oliver's next visit to the Kansas store was on March 1, 2002. Mousallet was on duty. Oliver asked Mousallet if any pseudoephedrine was available. Mousallet told Oliver to return to the store at 3:00 p.m., when Sdoulam was scheduled to work. Oliver returned shortly before 3:00 p.m., and, although Sdoulam had not yet arrived, Mousallet sold him twenty-four boxes of sixty-milligram antihistamine tablets containing pseudoephedrine for $140.00 in cash. Sdoulam arrived as Oliver was leaving, and Oliver observed Mousallet hand Sdoulam the cash. Oliver told the two owners that he would return in a few days to purchase additional pseudoephedrine. Oliver next spoke with Sdoulam on March 19, 2002. Sdoulam told Oliver that he was out of pseudoephedrine but suggested that they meet at a Home Depot parking lot two days later for the exchange of additional pseudoephedrine. On March 21, 2002, Sdoulam met Oliver at the Home Depot parking lot and sold Oliver thirty-six boxes of pseudoephedrine products for $360.00 in cash.

A second investigation related to the sale of pseudoephedrine at the Quick Stop stores was conducted by the Overland Park, Kansas Police Department (OPPD). On December 26, 2001, OPPD police arrested Christopher Queen and Nancy Queen for shoplifting thirteen boxes of cold medicines containing pseudoephedrine from a Target store. Upon searching the Queens' car in the Target parking lot, police found a paper bag containing forty-six additional boxes of various pseudoephedrine products. After being transported to the police department, Mr. Queen called the Kansas Quick Stop in an attempt to obtain bond money. At trial, Mrs. Queen testified that she and her husband had been stealing and providing to Mousallet 100–150 boxes of pseudoephedrine products per week since late fall 2001. The Queens delivered the pseudoephedrine products to Mousallet at a number of locations, including the Kansas and Missouri Quick Stop stores. Upon receipt, Mousallet would place the pseudoephedrine prod-

ucts either in the back rooms of the stores, behind the front counters, or in his car.

FBI agents arrested Sdoulam and Mousallet on April 23, 2002. Mousallet's car was searched and five boxes of pseudoephedrine products were found in a paper bag in the trunk. Sdoulam's minivan was searched and eighty-two blister packs of pseudoephedrine products, removed from their retail packaging, were found in a paper bag in the van.

Sdoulam was brought to trial on May 12, 2003. At the close of the evidence, the jury convicted Sdoulam of distributing and conspiring (with Mousallet, Mr. Queen, and Mrs. Queen) to possess and distribute pseudoephedrine, while having reason to believe the pseudoephedrine would be used to manufacture methamphetamine.[3] At the sentencing hearing, the District Court found that the amount of pseudoephedrine involved in the offenses was at least 300 grams but less than 1 kilogram, resulting in a base offense level of 34 under the Federal Sentencing Guidelines. The District Court then enhanced Sdoulam's base offense level by two points because the District Court determined that Sdoulam obstructed justice by perjuring himself while testifying under oath during the trial. Pursuant to the Guidelines, the District Court sentenced Sdoulam to 108 months in prison.[4]

## II.

■ Sdoulam first argues on appeal that his motion to dismiss Count One of the indictment should have been granted because Count One charges him with "conspir[ing] to commit a negligent act, which

is a legal impossibility." Appellant Brief at 41. We review the District Court's decision on the sufficiency of the indictment de novo. See United States v. Ferro, 252 F.3d 964, 965–66 (8th Cir.2001), cert. denied, 534 U.S. 1083, 122 S.Ct. 817, 151 L.Ed.2d 700 (2002); United States v. Zangger, 848 F.2d 923, 924 (8th Cir.1988).

Count One of the indictment provides in relevant part: "RADY I. SDOULAM [and others] ... did knowingly conspire, confederate, and agree with each other ... to possess and distribute ... pseudoephedrine, then having reasonable cause to believe that such chemical would be used to manufacture a controlled substance, that is, methamphetamine, in violation of Section 841(c)(2), Title 21, United States Code." Sdoulam asserts that the phrase "reasonable cause to believe," which is taken directly from 21 U.S.C. § 841(c)(2), creates a negligence standard. Using this interpretation, Sdoulam argues that Count One charges him with conspiring to commit a negligent act, which is contrary to the specific intent requirement necessary to support a conspiracy conviction.

■ We agree with Sdoulam that one cannot conspire to commit a negligent or unintentional act. We find, however, that Count One charges Sdoulam of conspiring to commit an intentional act: the violation of 21 U.S.C. § 841(c)(2). Section 841(c)(2) imposes criminal sanctions on "[a]ny person who knowingly or intentionally ... possesses or distributes a listed chemical knowing, or having reasonable cause to believe, that the listed chemical will be used to manufacture a controlled sub-

3. The jury also found that Sdoulam's minivan was used to facilitate the offenses and was therefore subject to forfeiture pursuant to 21 U.S.C. § 853(a)(2).

4. A base offense level of 36, coupled with a criminal history category of I, results in a Guidelines sentencing range of 188 to 235

months' imprisonment. However, the District Court granted Sdoulam's motion for downward departure for substantial assistance in the administration of justice, due to Sdoulam's agreement to waive his rights in connection with administrative deportation proceedings.

stance ...." 21 U.S.C. § 841(c)(2) (2000) (emphasis added). Sdoulam's argument that the "reasonable cause to believe" language of Section 841(c)(2) could punish a negligent act (such that Count One could be construed to charge Sdoulam of conspiring to commit a negligent act) is disingenuous.

Although Sdoulam is correct in his assertion that this Circuit has not specifically addressed whether "a charge of conspiracy to violate Section 841(c)(2) results in a legal impossibility," Appellant Brief at 42 n.9, this Circuit has addressed the underlying premise of Sdoulam's argument. In *United States v. Bewig* we noted that Section 841(c)(2) does not criminalize a negligent act: "The section does not punish the inadvertent sale of a listed chemical to an illegal drug manufacturer, but instead punishes only those sales where the seller understands, or should reasonably understand, that the chemical will be used illegally." 354 F.3d 731, 737 (8th Cir.2003) (addressing an argument that 21 U.S.C. § 841(c)(2) is unconstitutionally vague); *see also United States v. Saffo*, 227 F.3d 1260, 1268 (10th Cir.2000) (ruling that the "reasonable cause to believe" standard of 21 U.S.C. § 841(d)(2) [5] imposes a criminal *mens rea* requirement), *cert. denied*, 532 U.S. 974, 121 S.Ct. 1608, 149 L.Ed.2d 473 (2001). We also have analyzed the "reasonable cause to believe" language in the context of another federal felony statute and concluded that, although the language "[a]t first glance ... might appear to allow the conviction of a merely negligent defendant," the "better reading" requires a subjective examination of what was reasonable for the specific defendant to believe. *See United States v. Iron Eyes*, 367 F.3d 781, 784–85 (8th Cir.2004) (examining the "reasonable cause to believe" language of 18

U.S.C. § 922(j)); *see also Gorin v. United States*, 312 U.S. 19, 27–28, 61 S.Ct. 429, 85 L.Ed. 488 (1941) (ruling that the "reason to believe" language of the Espionage Act "requires those prosecuted to have acted in bad faith"). Under these cases, Sdoulam's assertion that 21 U.S.C. § 841(c)(2) might be construed to impose a negligence standard fails. Thus, in charging Sdoulam with conspiracy to violate the statute, Count One did not charge Sdoulam with conspiring to commit a negligent act.

To the extent, if any, that our past cases do not preclude Sdoulam's argument that a charge of conspiracy to violate Section 841(c)(2) is contrary to the specific intent or actual knowledge requirement of conspiracy, we adopt the reasoning of the Seventh Circuit, which has characterized this same argument as "erroneous and misleading." *United States v. Green*, 779 F.2d 1313, 1318 (7th Cir.1985). In *Green*, the court rejected the argument that a charge of conspiracy to possess and distribute piperidine in violation of 21 U.S.C. § 841(d)(2) [6] amounts to a charge of conspiracy to commit a negligent act. The court found that the actual knowledge requirement of conspiracy was satisfied because "the object of the conspiracy charged was the *knowing* and *intentional* possession of [a listed chemical] knowing and having reasonable cause to believe that it would be used to manufacture [a controlled substance]." *Id.* (emphasis in original). Under this reasoning, we likewise hold that a charge of conspiracy to violate Section 841(c)(2) satisfies the specific intent requirement and does not give rise to a "legal impossibility."

### III.

 Sdoulam next argues that the District Court erred in admitting the testi-

5. In 2000, Congress redesignated 21 U.S.C. § 841(d)(2) as 21 U.S.C. § 841(c)(2), the statute under which Sdoulam was charged.

6. *See supra* note 5.

mony of the government's expert statistician. The expert, Jonathan Robbin, testified about the estimated monthly average of pseudoephedrine sales at convenience stores nationwide in comparison with the estimated monthly average of pseudoephedrine sales at the Kansas Quick Stop. Using local and national census and marketing data, Robbin extrapolated that the amount of pseudoephedrine product sales by convenience stores nationwide was approximately $24.00 per month. Then, considering the amount of pseudoephedrine products that the Kansas store purchased from wholesalers, as determined by the wholesalers' business records, Robbin extrapolated that the amount of pseudoephedrine product sales by the Kansas store would have averaged $530.00 per month if the products were sold in "ordinary retail sales transactions." At trial, Robbin contrasted the two amounts as follows:

Q. Going back to our statistical framework and our Bell curve, what kind of standard deviation are we talking about in the Kansas store?

A. At the Kansas Store for combination ingredients the difference, the standard error, is just phenomenal, so large that the probability of that being small . . .

[objection]

Q. You can continue your answer.

A. Yes, the sale by the Kansas City store of $500 a month worth of combined ingredients pseudoephedrine is 123 times the expected sale . . . . The standard error, if we compute, which in a normal statistical wouldn't bother reporting such a huge difference, [is a] ridiculous 730 standard deviations from the mean.

Q. What percentage figure would that be from the norm if you had calculated it?

A. It would be infinitesimal. The probability of encountering such a large standard deviation and grand sampling in the real world would be so small it would be smaller than say the probability one would cover one atom in all atoms in the universe. For all basic purposes, it would be zero, no.

Trial Tr. at 529–31.

Sdoulam argues that this testimony was inadmissible for two reasons. First, Sdoulam asserts that Robbin's testimony constituted impermissible evidence of "statistical probability of guilt," insofar as it suggested an "infinitesimal" probability that the pseudoephedrine sales at the Kansas store were made in legitimate retail transactions. Appellant Brief at 25. Implicit in this testimony, Sdoulam argues, is a "concomitant suggestion of a practically certain probability that the sales were illicit, criminal transactions." *Id.* at 26. Second, Sdoulam asserts that Robbin's testimony was irrelevant because the indictment alleged that the defendants purchased "stolen products containing pseudoephedrine," not that the defendants purchased products containing pseudoephedrine via legitimate wholesale channels. *Id.* Sdoulam contends that Robbin's testimony was "other act" evidence not charged in the indictment and having a prejudicial effect far in excess of its probative value. *Id.*

■■ We review for abuse of discretion a district court's decision to admit expert testimony. *See United States v. Hernandez,* 299 F.3d 984, 991 (8th Cir.2002), *cert. denied,* 537 U.S. 1134, 123 S.Ct. 918, 154 L.Ed.2d 825 (2003). Expert testimony is generally admissible if it is based upon scientifically valid methodology that is properly applied to the facts in issue. *See Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 592, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *see also* Fed.R.Evid. 702.

We hold that the District Court did not abuse its discretion in admitting Robbin's testimony. First, we reject Sdoulam's argument that Robbin's testimony amounted to improper evidence of the statistical probability that Sdoulam was guilty. The standards governing expert testimony of statistical probabilities are set out in *United States v. Kandiel*. 865 F.2d 967 (8th Cir.1989). In *Kandiel*, the defendant was convicted on thirteen counts, including making false representation of citizenship and making false statements in applications for passports. *Id.* at 969. The issue of the defendant's true identity was critical, as the defendant asserted that he was not Mohammed Kandiel, the Egyptian national charged in the indictment but, rather, was Jeff Howard, the son of a Native American woman. *Id.* At trial, the government introduced the testimony of an expert who compared a genetic marker in the defendant's blood to random population studies of blood group typings. *Id.* at 970. Based on this comparison, the expert testified that the defendant was "seventeen times more likely than someone from a random population" to be the brother of Ahmed Kandiel, an Egyptian national. *Id.* at 971. The expert further testified that the genetic tests indicated that there was only a "one in 1,000" chance that the defendant was the child of a Native American. *Id.* The defendant argued that such testimony "impermissibly established by mathematical certainty that [he] was Egyptian-born Mohammed Kandiel." *Id.* On appeal, this Court upheld the admittance of the expert testimony, ruling that "[s]tatistical evidence is not inadmissible per se." *Id.* at 971–72. We deemed the testimony proper because the expert laid adequate "foundational support" for the statistical probabilities by relying on scientific studies and because the testimony did not "serve to reduce the ultimate question of guilt or innocence to one of mathematical probabilities." *Id.* at 971.

We find Robbin's testimony materially indistinguishable from the expert testimony admitted in *Kandiel*. As in *Kandiel*, Robbin laid adequate foundational support for his conclusions by explaining their bases—national census population and marketing data and the business records of Sdoulam's wholesale suppliers. Moreover, Robbin made no statement regarding the mathematical probability that Sdoulam was guilty of the crimes charged. Robbin's testimony consisted of nothing more than a comparison of the amount of expected monthly sales of pseudoephedrine products by the average convenience store to the amount of estimated sales of pseudoephedrine products by the Kansas store. While this testimony made the government's burden of proof on a critical element of the crimes charged more likely satisfied than not, as in *Kandiel*, the jury was left to draw whatever conclusions it wished from this comparison.

We also reject Sdoulam's assertion that Robbin's testimony was irrelevant and unduly prejudicial. Indeed, it is the very fact that the testimony helped to prove Sdoulam guilty of the charged offenses that made the testimony relevant. *See* Fed. R.Evid. 401. The indictment charged Sdoulam with distributing pseudoephedrine and conspiring to distribute pseudoephedrine while having reasonable cause to believe that the pseudoephedrine would be used to manufacture a controlled substance. Robbin's testimony showing that the amount of pseudoephedrine products sold at the Kansas store was inordinately greater than the national average was material to the issue of whether Sdoulam had reason to believe that the pseudoephedrine was being used to manufacture a controlled substance. Robbin's estimation of the average retail sales of pseudoephedrine products at convenience stores also indicated the amount of legitimate sales one might expect at the Kansas Quick

Stop. The wholesale invoices showed that the amount of pseudoephedrine products purchased by the Kansas store greatly exceeded expected legitimate consumer demand and indicated that Sdoulam and his partner were obtaining large quantities of these products to sell to persons without a legitimate need for the medications. The fact that the indictment did not specifically mention the purchase of pseudoephedrine products from wholesalers did not substantially prejudice Sdoulam and does not make Robbin's testimony inadmissible. *See United States v. Cuervo*, 354 F.3d 969, 988 (8th Cir.2004) ("We review claims of variances between the indictment and proof at trial to determine if the variance substantially prejudiced the defense."), *cert. denied,* —— U.S. ——, 125 S.Ct. 199, 160 L.Ed.2d 108 (2004).

## IV.

Sdoulam's third argument for reversal is that there was a fatal variance between the conspiracy charged in the indictment and the evidence presented at trial in that the evidence demonstrated either multiple conspiracies or a different conspiracy than the one charged. As noted by Sdoulam, the indictment alleged that Mr. Queen and Mrs. Queen "would steal boxes containing pseudoephedrine products from retail stores, and then sell these stolen products to [Sdoulam and Mousallet]" and that Sdoulam and Mousallet "then sold these products to persons whom they believed or knew to be manufacturing methamphetamine." Indictment at 3. Sdoulam argues that the evidence at trial, however, failed to demonstrate that he had any knowledge of or involvement in the Queens' shoplifting or sale of pseudoephedrine products to Mousallet. Moreover, Sdoulam asserts, the evidence at trial was that Sdoulam and Mousallet obtained the vast majority of the pseudoephedrine products from wholesale distributors, not from the Queens.

"The issue of whether a single conspiracy or multiple conspiracies existed is a question for the jury." *United States v. Adipietro*, 983 F.2d 1468, 1475 (8th Cir. 1993). In reviewing claims of variances between the indictment and proof at trial, we examine whether a reasonable jury could have determined that the defendant participated in the single conspiracy charged in the indictment. *See United States v. Regan*, 940 F.2d 1134, 1135 (8th Cir.1991). In so doing, we view the evidence in the light most favorable to the verdict. *See United States v. Crouch*, 46 F.3d 871, 874 (8th Cir.1995), *cert. denied,* 516 U.S. 871, 116 S.Ct. 193, 133 L.Ed.2d 129 (1995); *United States v. Dijan*, 37 F.3d 398, 403 (8th Cir.1994), *cert. denied,* 514 U.S. 1044, 115 S.Ct. 1418, 131 L.Ed.2d 302 (1995). Even if a variance is found to exist, the conviction will be upheld unless we find that the defendant was prejudiced by the variance. *See United States v. Lopez–Arce*, 267 F.3d 775, 781 (8th Cir. 2001).

A single conspiracy "involves two or more persons agreeing to commit a criminal offense plus an act in furtherance of the conspiracy." *Adipietro*, 983 F.2d at 1475; *see also United States v. Watts*, 950 F.2d 508, 512 (8th Cir.1991), *cert. denied,* 503 U.S. 911, 112 S.Ct. 1276, 117 L.Ed.2d 502 (1992). "A single conspiracy can exist notwithstanding the fact that the participants or their roles change or that multiple groups performing separate crimes or acts exist." *Adipietro*, 983 F.2d at 1475 (internal citations omitted). Moreover, a defendant "does not have to be aware of the existence of all other conspirators or all the details of the conspiracy, as long as the evidence shows s/he made a knowing act in furtherance of the conspiracy." *Watts*, 950 F.2d at 512; *see also, United States v. Baker*, 855 F.2d 1353, 1357 (8th Cir.1988) (holding that the defendant "did

not have to be personally acquainted" with the other defendants in order to participate in the conspiracy), *cert. denied,* 490 U.S. 1069, 109 S.Ct. 2072, 104 L.Ed.2d 636 (1989).

Viewing the evidence in the light most favorable to the government, there was ample support for the jury's finding that Sdoulam engaged in the single conspiracy charged in the indictment. The evidence showed that, on at least one occasion, Oliver purchased large quantities of pseudoephedrine at the Kansas store from Mousallet, who then handed the money to Sdoulam. On his way out of the store, Oliver told Sdoulam, in Mousallet's presence, that he would return in a few days to purchase additional pseudoephedrine. The evidence also showed that, although the Queens usually sold stolen pseudoephedrine products to Mousallet, it was Sdoulam who sold a bulk quantity of pseudoephedrine blister packs to Oliver on February 8, 2002. It is reasonable to infer that these products had been removed from their retail packaging in order to mask the fact that they had been stolen by the Queens from other stores. Moreover, in negotiating the price of the products, Sdoulam told Oliver that he had to "split [the money] with my buddy," from which the jury could reasonably infer that Sdoulam and Mousallet worked together in obtaining the blister packs. Eighty-two blister packs were also found in Sdoulam's minivan upon his arrest. Finally, the evidence established that Sdoulam and Mousallet were partners, and both the purchase and sale of large quantities of pseudoephedrine products revolved around the Quick Stop stores. Indeed, Mr. Queen called the Kansas store on the night of his arrest to obtain bail money. It is without consequence that Sdoulam may not have dealt directly with Mr. and Mrs. Queen, as the evidence supports a finding that all four defendants knew that they were participating in a drug conspiracy. *See Baker,* 855 F.2d at 1357 (holding that the supplier of drugs and the seller of drugs were part of the same drug conspiracy, even though each had only met the "middleman" and not one another).

■ Sdoulam's argument that a variance further exists because the evidence at trial indicated that the bulk of the pseudoephedrine products was purchased from wholesalers, while the indictment lists purchases from shoplifters as overt acts, is also without merit. The inclusion of some overt acts in an indictment does not bar proof of other acts, and proof of other acts in furtherance of the same conspiracy does not constitute a variance. The jury was specifically instructed that Sdoulam could only be found guilty of conspiracy if the jury found that the conspiracy charged in the indictment, *and not another conspiracy,* was the conspiracy in which Sdoulam participated.[7] *Cf. Watts,* 950 F.2d at 512 ("[J]ury did not have the option of convicting ... on a different conspiracy ... but was instructed to find only one particular conspiracy and determine its members."); *Adipietro,* 983 F.2d at 1475 ("[T]he instructions given to the jury by the district court would only permit the jury to arrive at a finding of guilt for each defendant if the jury found that the conspiracy charged in the indictment was the conspiracy engaged in by that defendant."). The jury found Sdoulam guilty of participating in the conspiracy charged in the indictment involving stolen pseudoephedrine products purchased from the Queens, and the evidence is ample to support the jury verdict. We conclude that Sdoulam's variance argu-

---

7. This instruction was taken from the Eighth Circuit Manual of Model Jury Instructions (Criminal), Instruction 5.06(G) (2000).

ment is without merit; the District Court correctly denied Sdoulam's motion for judgment of acquittal or a new trial.

## V.

■■■■ Sdoulam next challenges the District Court's decision to instruct the jury on deliberate ignorance and on permissive inference. In reviewing challenges to jury instructions, this Court recognizes that "the district court has wide discretion in formulating the instructions," and we will "affirm if the entire charge to the jury, when read as a whole, fairly and adequately contains the law applicable to the case." *United States v. Phelps*, 168 F.3d 1048, 1057 (8th Cir.1999) (internal citation and quotations omitted). An instruction is properly given if it is a correct statement of the law and supported by the evidence. *See Arkwright Mutual Ins. Co. v. Gwinner Oil, Inc.*, 125 F.3d 1176, 1180 (8th Cir. 1997). In deciding whether the evidence warranted a particular instruction, we view the evidence, and any reasonable inferences from that evidence, in the light most favorable to the party defending the instruction. *See United States v. Gonzales*, 90 F.3d 1363, 1371 (8th Cir.1996); *United States v. Hildebrand*, 152 F.3d 756, 764 (8th Cir.1998), *cert. denied*, 525 U.S. 1033, 119 S.Ct. 575, 142 L.Ed.2d 479 (1998).

■■■■ We have reviewed the instructions given to the jury and are convinced that the District Court committed no error in fairly and adequately stating the appli-

cable law. First, the District Court did not abuse its discretion by giving the deliberate ignorance instruction.[8] "A deliberate ignorance instruction is appropriate when the defendant asserts a lack of guilty knowledge, but the evidence supports an inference of deliberate ignorance." *Hildebrand*, 152 F.3d at 764. Deliberate ignorance is established if the defendant was "presented with facts that put him on notice that criminal activity is probably afoot" but "failed to investigate those facts, thereby deliberately declining to verify or discover the criminal activity." *Id.* (quoting *United States v. Barnhart*, 979 F.2d 647, 652 (8th Cir.1992)).

Sdoulam's defense at trial was that he lacked knowledge and had no reason to believe that the pseudoephedrine was being used to manufacture methamphetamine, in part because he spoke only limited English. Thus, according to Sdoulam, he did not comprehend what Babcock meant when Babcock told him that her friend was interested in purchasing large quantities of pseudoephedrine products to make "meth," nor what Oliver meant when Oliver told him that he would prefer to purchase sixty-milligram tablets, rather than thirty-milligram tablets, because it "takes too many [thirty-milligram tablets] to cook." Trial Tr. at 709. The government presented evidence, however, that when Sdoulam did not understand other English references, such as to "connections" and "coffee filters," Sdoulam asked

---

**8.** The District Court instructed the jury as follows:

You may find that a defendant acted knowingly if you find beyond a reasonable doubt that such defendant was aware of a high probability that large quantities of pseudoephedrine were being purchased by a single buyer for the purpose of manufacturing methamphetamine, and that the defendant deliberately avoided learning the truth. The element of knowledge may be inferred if the defendant deliberately closed his eyes

to what would otherwise have been obvious to him.

You may not find that the defendant acted knowingly, however, if you find that the defendant actually believed that the pseudoephedrine was being purchased for legitimate purposes. A showing of negligence, mistake, or carelessness is not sufficient to support a finding of knowledge.

Final Instructions Read to the Jury; Instruction No. 34.

the speaker for definitions and/or contextual explanations. *Id.* at 662–67, 907. The evidence also showed that Sdoulam sold pseudoephedrine products to a single buyer in amounts that far exceeded the recommended dosage, and often in blister packs without consumer use instructions. Given this evidence, a reasonable jury could have found that Sdoulam suspected that the pseudoephedrine products that he was selling in bulk were probably being used for criminal means but deliberately failed to investigate. Sdoulam correctly notes that this evidence also could have supported a finding that he actually *knew,* and was not *ignorant,* that the pseudoephedrine was being used to manufacture methamphetamine, but we have held that a superfluous giving of the instruction is not reversible error. *See United States v. King,* 351 F.3d 859, 867 (8th Cir.2003) (holding that the district court did not commit reversible error in giving deliberate ignorance instruction when the evidence suggested that the defendant knew of the criminal scheme), *cert. denied,* —— U.S. ——, 124 S.Ct. 2852, 159 L.Ed.2d 269 (2004). The District Court did not abuse its discretion in giving the deliberate ignorance instruction.

■ Nor did the District Court abuse its discretion in giving the permissive inference instruction.[9] The District Court instructed the jury that it was permitted to infer that Sdoulam had reasonable cause to believe that the pseudoephedrine was being used to manufacture methamphetamine if the jury found that Sdoulam knew that pseudoephedrine could be used to manufacture methamphetamine and that Sdoulam either purchased abnormally large quantities of pseudoephedrine products or sold pseudoephedrine products in a way that they would not normally be sold from a retail outlet. This instruction permitted the jury to make an inference as to Sdoulam's state of mind, but it also clearly indicated that the jury was "not required" to make the inference. Final Instructions Read to the Jury, Instruction No. 26. Thus, the instruction was one of permissive, not mandatory, inference. *See United States v. Clark,* 45 F.3d 1247, 1250–51 (8th Cir.1995); *United States v. Kocher,* 948 F.2d 483, 486 (8th Cir.1991). Instructions on permissive inferences are constitutional so long as the suggested conclusion is "one that reason and common sense justify in light of the proven facts before the jury." *Clark,* 45 F.3d at 1250. Given the evidence of the stolen pseudoephedrine products coming from the Queens, of the abnormally large purchase of pseudoephedrine products from wholesalers, and of the bulk sales of pseudoephedrine products (sometimes without retail packaging), we find that reason and common sense support the giving of the permissive inference instruction.

---

9. The District Court instructed the jury as follows:

That the defendants had reasonable cause to believe that pseudoephedrine would be used to manufacture a controlled substance, that is, methamphetamine is an essential element of each of the offenses charged, which must be proved beyond a reasonable doubt. If you find proof beyond a reasonable doubt that a defendant purchased large quantities of stolen pseudoephedrine, or that a defendant purchased abnormally large amounts of pseudoephedrine from wholesalers, or that a defendant

sold pseudoephedrine in such a way that the chemical would not normally be sold from a retail outlet, and there is additional evidence that a defendant knew that pseudoephedrine could be used to manufacture methamphetamine, these are facts from which you may, but are not required to, find or infer that a defendant had reasonable cause to believe that pseudoephedrine which he sold would be used to manufacture methamphetamine.

Final Instructions Read to the Jury, Instruction No. 26.

We are satisfied that the District Court did not abuse its discretion in giving either of the challenged instructions.

## VI.

■ Finally, Sdoulam argues that his sentence violates the Sixth Amendment because it was based on judge-found facts regarding drug quantity [10] and obstruction of justice. *See Booker,* —— U.S. at ——, 125 S.Ct. at 756. At the sentencing hearing, Sdoulam objected to both the District Court's finding of pseudoephedrine quantity and to the two-point enhancement for obstruction of justice. This Circuit has held that when a defendant objects to a District Court's determination of drug quantity at sentencing, the defendant preserves a *Booker*-based challenge to his sentence and is entitled to a new sentencing proceeding. *United States v. Coffey,* 395 F.3d 856, 2005 WL 119843 (8th Cir. Jan. 21, 2005), 2005 U.S.App. Lexis 1090; *United States v. Fox,* 396 F.3d 1018, 2005 WL 195429 (8th Cir. Jan. 31, 2005), 2005 U.S.App. Lexis 1454. Accordingly, we remand for resentencing in accordance with *Booker.*

In summary, we affirm Sdoulam's convictions but remand for resentencing in accordance with *Booker.*

---

10. Neither the indictment nor the jury's verdict stated an amount of pseudoephedrine attributable to Sdoulam.