# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee,*

v.

CARMEN DENISE HEREDIA,
    *Defendant-Appellant.*

No. 03-10585

D.C. No.
CR-02-00773-JMR-
JJM

OPINION

Appeal from the United States District Court
for the District of Arizona
John M. Roll, District Judge, Presiding

Argued and Submitted
December 7, 2004—San Francisco, California

Filed October 24, 2005

Before: Alex Kozinski, William A. Fletcher, and
Jay S. Bybee, Circuit Judges.

Opinion by Judge Bybee;
Dissent by Judge Kozinski

**COUNSEL**

Wanda K. Kay, Tucson, Arizona, for the appellant.

Nathan D. Leonardo (argued) and Jeffrey H. Jacobson, Assistant U.S. Attorneys, Tucson, Arizona, for the appellee.

**OPINION**

BYBEE, Circuit Judge:

Carmen Heredia ("Heredia") was convicted of knowingly possessing contraband with intent to distribute in violation of 21 U.S.C. § 841(a) (2000), after the district court instructed the jury that the "knowingly" element is satisfied if she was deliberately ignorant of the truth. The issue on appeal is whether the evidence was sufficient to warrant the "deliberate ignorance" or "*Jewell*" jury instruction. *See United States v. Jewell*, 532 F.2d 697 (9th Cir. 1976) (en banc). After the jury returned the guilty verdict, Heredia moved for a new trial on

the grounds that the evidence did not warrant the *Jewell* instruction. The district court denied the motion, and Heredia now appeals.

We find that the government did not provide sufficient evidence to warrant the deliberate ignorance instruction. We therefore reverse the district court's denial of Heredia's motion for a new trial, and remand.

## I.   BACKGROUND

Heredia was driving from Nogales, Arizona, to Tucson when she was stopped at a Border Patrol checkpoint. In the car with her was her mother, Raquel Moreno; her aunt, Beatriz Moreno; and two of Heredia's young children. The Border Patrol agent noticed a perfume scent emanating from the car, and referred the car to the secondary inspection area. There, Heredia was asked to open the trunk. When neither the ignition key nor the interior trunk release button worked, an agent removed the back seat and saw two suspicious bundles. A complete search of the car produced twelve bundles, yielding 349.2 pounds of marijuana. The bundles were covered with dryer sheets, a method for concealing the odor of marijuana, that produces a strong detergent scent in the car. Heredia was arrested and charged with knowingly possessing contraband with intent to distribute, in violation of 21 U.S.C. § 841(a).

The facts leading up to Heredia driving the car to Tucson are subject to much dispute by the witnesses. Heredia testified at trial that she had visited Nogales, Arizona to attend a funeral and had stayed at the home of an aunt, Belia Alvarado. She left her aunt's home early in the morning and returned to Tucson with her husband and children. After her husband went to work, and her oldest child went to school, Heredia's mother called and asked if Heredia would accompany her back to Nogales for a dentist's appointment. Heredia gathered her two youngest children and, along with her

mother, rode a public shuttle to Nogales. Belia picked up the group at the shuttle stop in Nogales and took them back to her house. From there, Heredia's mother borrowed an automobile owned by Belia, drove it to the dentist's office, and returned from the office with her sister, Heredia's aunt, Beatriz Moreno. While Heredia, her children, her mother, and Beatriz waited at the house, Belia took the car on an errand, and returned a couple hours later.

Heredia told a DEA agent that as she prepared to take Belia's car to Tucson, Heredia noticed a strong detergent odor in the car. When she asked Belia about it, Belia claimed that she had spilled "Downey" in the car a few days earlier. The DEA agent further testified that Heredia admitted to finding the explanation implausible, but nonetheless elected to drive the car to Tucson. Heredia later denied ever smelling the Downey or discussing it with her aunt.

Heredia further testified that as they drove along the interstate, she noticed that her aunt and mother were acting strangely: they both appeared nervous, her aunt was drinking alcohol, and her mother was smoking more than usual. When Heredia asked her mother to stop smoking because one of her children had bronchitis, her mother put out the cigarette, immediately sprayed air freshener in the car, and opened the window. Heredia admitted at trial that at that point, she began to suspect that something was wrong. She further admitted that this suspicion was informed by the fact that her mother and aunt seemed to have undue amounts of cash on hand, and that her mother's boyfriend abused drugs. Heredia testified that the thought occurred to her that there might be drugs in the car, and that she considered turning around. By the time that her suspicion rose to that level, however, she had passed the last interstate exit before the checkpoint.

Heredia's mother and aunts also testified at trial, likewise denying knowledge of the marijuana. Their testimony not only contradicted Heredia's, but contradicted each other's

and, often times, was internally inconsistent. Belia claimed that Heredia had left Belia's house with her husband, and that at that point the trunk of the car was empty, thus implying that Heredia and/or her husband might have placed the marijuana in the car. Belia denied spilling detergent in the car. Beatriz gave testimony that directly contradicted her earlier statements to a Drug Enforcement Administration agent concerning whether Heredia's husband was present and the sequence in which Beatriz and Heredia had each arrived at Belia's house. Heredia's mother likewise gave multiple statements concerning the persons present and the sequence in which they arrived that directly contradicted previous interviews. Collectively, the testimony offered by Beatriz, Belia, and Heredia's mother, Raquel, suggested that Heredia or her husband could have been responsible for the marijuana in the vehicle.

The district court instructed the jury on the government's alternative theories: that Heredia either knew the marijuana was in the car from the outset, or that she was deliberately ignorant. The court gave the following deliberate ignorance or *Jewell* instruction:

> You may find that the defendant acted knowingly if you find beyond a reasonable doubt that the defendant was aware of a high probability that drugs were in the vehicle driven by the defendant and deliberately avoided learning the truth. You may not find such knowledge, however, if you find that the defendant actually believed that no drugs were in the vehicle driven by the defendant, or if you find that the defendant was simply careless.

*See* NINTH CIR. MODEL JURY INSTRUCTIONS 5.7. Heredia timely objected to the instruction. After the jury returned a guilty verdict, Heredia filed a motion for a new trial on the grounds that the evidence did not warrant the deliberate ignorance

instruction. The district court denied the motion in a minute order, and Heredia appealed.

## II.   STANDARD OF REVIEW

The court reviews a district court's decision to give a deliberate ignorance instruction *de novo*. *United States v. Shannon*, 137 F.3d 1112, 1117 (9th Cir. 1998).

## III.   ANALYSIS

In *Jewell*, we first considered whether one can "knowingly" possess contraband without having actual knowledge of it. Jewell was approached by a stranger in Tijuana and offered money to drive across the border in a vehicle that Jewell knew contained a secret compartment. *Jewell*, 532 F.2d at 699 n.1. Although the government presented only circumstantial evidence that Jewell knew that the compartment contained marijuana, it argued that Jewell deliberately avoided obtaining actual knowledge in order to avoid responsibility. *Id.* at 699. Noting that "the rule that wilful blindness is equivalent to knowledge is essential, and is found throughout the criminal law," we held that evidence of deliberate ignorance is sufficient to meet the knowledge requirement of 21 U.S.C. § 841(a). *Id.* at 700 n.7 (citing G. WILLIAMS, CRIMINAL LAW: THE GENERAL PART, § 57 at 159 (2d ed. 1961)). We observed that interpreting § 841(a) to require actual knowledge would make deliberate ignorance a defense, and that "[i]t cannot be doubted that those who traffic in drugs would make the most of it." *Id.* at 703. We observed that deliberate ignorance or willful blindness differ from positive knowledge "only so far as necessary to encompass a calculated effort to avoid the sanctions of the statute while violating its substance." *Id.* at 704. Accordingly, we held that the government's evidence of deliberate ignorance was sufficient to meet the knowledge requirement of § 841(a), and affirmed the conviction. *Id.* at 704.

**[1]** In the years since we decided *Jewell*, we have restricted the circumstances under which we will permit the instruction to be issued. We have warned that the instruction is "rarely appropriate," and should be given only when the government presents "specific evidence" that the defendant "(1) actually suspected that he or she might be involved in criminal activity, (2) deliberately avoided taking steps to confirm or deny those suspicions, and (3) did so in order to provide himself or herself with a defense in the event of prosecution." *United States v. Baron*, 94 F.3d 1312, 1318 n.3 (9th Cir. 1996). It is not enough that the defendant "was mistaken, recklessly disregarded the truth or negligently failed to inquire." *United States v. Kelm*, 827 F.2d 1319, 1324 (9th Cir. 1987) (citing *United States v. Pacific Hide & Fur Depot, Inc.*, 768 F.2d 1096, 1098 (9th Cir. 1985)). The instruction should therefore "be rarely given because of the risk that the jury will convict on a standard of negligence: that the defendant *should* have known the conduct was illegal." *United States v. Alvarado*, 838 F.2d 311, 314 (9th Cir. 1988) (citing *United States v. Garzon*, 688 F.2d 607 (9th Cir. 1982)). The purpose of the *Jewell* instruction is to correct for those cases of "willful blindness," where the defendant "suspects a fact, realizes its probability, but refrains from obtaining final confirmation in order to be able to deny knowledge if apprehended." *United States v. Mapelli*, 971 F.2d 284, 286 (9th Cir. 1992). *See also Kelm*, 827 F.2d at 1324.

The government may not request a *Jewell* instruction to close the gaps in its case. "[A] *Jewell* instruction is not appropriate where the only evidence alerting a defendant to the high probability of criminal activity is direct evidence of the illegality itself." *United States v. Sanchez-Robles*, 927 F.2d 1070, 1074 (9th Cir. 1991). In *Sanchez-Robles*, the odor of marijuana was so strong in the van that the inspectors had to take fresh air breaks, yet the defendant denied that she knew what marijuana smelled like. We held that it was error to issue a *Jewell* instruction because either the defendant knew what the odor was, or she did not. If she did, the government had direct

evidence that she was knowingly in possession of the marijuana; if not, then she had no reason to be suspicious. *Id.* at 1076. Thus, the government must identify its theory or theories of the case: if the government's evidence supports only actual knowledge and not deliberate ignorance, then it may not obtain a *Jewell* instruction. *Id.* at 1074-75; *United States v. Perez-Padilla*, 846 F.2d 1182, 1183 (9th Cir. 1988). The *Jewell* instruction is proper only when the government provides "specific evidence" that the defendant was deliberately ignorant of the criminal nature of the activity in which he was involved. *Mapelli*, 971 F.2d at 286.

In this case the government had it both ways. It argued, in effect, that Heredia knew the marijuana was in the trunk, and that, even if Heredia did not know, she nevertheless suspected there was marijuana in the car and deliberately ignored that fact. The fact that the government argued its case in the alternative affects the way that we approach this appeal. We have no way of knowing whether the jury convicted Heredia on the basis of actual knowledge or deliberate ignorance; nor do we know whether the jury even agreed on the facts, or only on the result. Contrary to the dissent's argument, Dissent at 14554-55, we cannot assume that Heredia would have been convicted absent a deliberate ignorance instruction. Accordingly, if the *Jewell* instruction was not proper, we must reverse even if we thought there might otherwise be sufficient evidence to sustain a conviction on the theory that Heredia actually knew of the marijuana. Since Heredia only challenges the issuing of the *Jewell* instruction, we need not concern ourselves with the confusing, contradictory and self-serving evidence received from Heredia's mother and aunts suggesting that Heredia and her husband had access to the car and must have put the marijuana in the trunk. This evidence points only to actual knowledge and cannot support a *Jewell* instruction.

We thus proceed to consider whether there is specific evidence that Heredia actually suspected that she was involved

in criminal activity and, if so, that she deliberately avoided taking steps to confirm her suspicions in order to provide herself with a defense.

### A

The government emphasizes two moments at which the circumstances were sufficient to give rise to an actual suspicion on Heredia's part that she was involved in criminal activity. This first occurred when she initially picked up her aunt's car, noticed the detergent smell, and after asking her aunt about it, admitted to not believing the explanation. The second is Heredia's own admission that it dawned on her just before she reached the checkpoint that something funny was going on and that she might be driving a car containing illegal drugs.

[2] The second of these points is sufficient to satisfy the first prong of the *Jewell* test, that Heredia "actually suspected that . . . she might be involved in criminal activity." *Baron*, 94 F.3d at 1318 n.3. Heredia testified that she "felt something was wrong" given the behavior of her aunt and mother. Later in Heredia's testimony, when repeatedly asked about whether she suspected that drugs were in the car while driving down the interstate, she consistently answered in the affirmative. Her admission to actually suspecting that drugs were in the car is clearly sufficient to satisfy the first prong of the *Jewell* test.

We must nevertheless consider whether Heredia's noticing the detergent smell was sufficient to constitute actual suspicion, because the timing of *when* she suspected she might be involved in criminal activity bears on our subsequent analysis: the moment at which the evidence suggests that she may have actually suspected criminal activity is crucial to determining whether the reason that she deliberately avoided taking steps to confirm or deny her suspicion was to provide herself with a defense.[1] The basis of the government's case on this point

---

[1]Although Heredia denied noticing the Downey smell or asking her aunt about it, we accept for purposes of this appeal those facts that would sup-

is the testimony of DEA agent Travis Birney. He testified at trial that after Heredia was detained at the border patrol checkpoint, he picked her up and brought her to the DEA office. There, he questioned her about the trip, and she explained that she smelled the detergent, asked her aunt about it, and did not believe the explanation.

We have previously held that mere odors are insufficient to place a defendant on notice that she might be involved in criminal activity. In *Baron*, 94 F.3d at 1312, Baron was approached by an acquaintance named Salgado who tapped on his window in the middle of the night and asked him to drive his vehicle from Los Angeles to Phoenix in exchange for $200 and a return plane ticket. Salgado proffered the innocent explanation that he had to fly to Phoenix unexpectedly for a job interview. Baron agreed to make the drive, and he testified that he found nothing out of the ordinary about the vehicle, except that it emitted a pronounced cherry scent. The government emphasized Baron's failure to investigate the source of the scent as proof of his deliberate ignorance. *Id.* at 1317-18.

We held that the district court committed plain error in issuing the *Jewell* instruction. We found that the government had not provided sufficient evidence that the defendant suspected that Salgado was involved in drug trafficking; accordingly, there was no specific evidence that Baron " 'ha[d] his suspicion aroused.' " *Id.* at 1318 (quoting *United States v. Aguilar*, 80 F.3d 329, 331 (9th Cir. 1996)). The cherry scent, combined with the circumstances under which Salgado asked Baron to make the drive, suggested "at most . . . that Baron was negligent or reckless in disregarding the risk that the car contained drugs." *Id.* Although the circumstances in *Baron*

___

port the government's theory. *See, e.g., United States v. Zavala-Mendez*, 411 F.3d 1116, 1118 (9th Cir. 2005); *United States v. Bahena-Cardenas*, 411 F.3d 1067, 1073 (9th Cir. 2005).

were suspect from the onset, they did not constitute sufficient evidence that the defendant actually suspected criminal activity. *See also Sanchez-Robles*, 927 F.2d at 1075-76.

**[3]** The testimony at trial suggested that Heredia recognized the detergent smell. There is no evidence that she knew that such odors can be used to mask the odor of marijuana. Although such odors might alert agents, inspectors and police who have been trained to detect them, ordinary citizens will not be on alert every time they smell detergent. "[A] strong odor in a [car], without more, does not normally arouse suspicions of illegality." *Id.* at 1075.

In addition, our cases have looked carefully to the defendant's relationship to the offeror. In what we have referred to as "a pattern common in these cases," the defendant is approached by a stranger or mere acquaintance under circumstances that warrant being cautious and suspicious. *See Jewell*, 532 F.2d at 699 n.1; *Sanchez-Robles*, 927 F.2d at 1074 ("Cases following *Jewell* show a similar pattern of suspicious circumstances . . . ." ). *See also United States v. Asuncion*, 973 F.2d 769 (9th Cir. 1992) (acquaintance offers defendant cash and a plane ticket in exchange for transporting two boxes between Hawaii and the Philippines); *Perez-Padilla*, 846 F.2d at 1182 (a stranger offers defendant cash to carry plastic baggie filled with an unidentified substance in his jacket to Tijuana); *United States v. McAllister*, 747 F.2d 1273 (9th Cir. 1984) (stranger known to defendant only by first name offers small amount of cash to drive truck through closed scales to avoid border control checkpoint); *United States v. Suttiswad*, 696 F.2d 645 (9th Cir. 1982) (stranger gives defendant airplane ticket and substantial gifts to transport suitcase across border); *Pacific Hide & Depot, Inc.*, 768 F.2d at 1098 (citing additional cases). Even more obviously, though less commonly, the defendant is approached by an individual whom the defendant knows to be a drug dealer. *See, e.g., United States v. Nicholson*, 677 F.2d 706, 707-08 (9th Cir. 1982). Such circumstances "put any reasonable person on notice that

there [is] a 'high probability' that the undisclosed venture [is] illegal." *Id.* at 710-11.

[4] Heredia's relationship with her putative offeror(s) makes it even less likely that her suspicion would be aroused by a common household smell, a smell notable only because she allegedly detected it in the car, not in the house. Heredia allegedly noticed the detergent odor in a car owned by her own aunt. When she commented on it, her aunt answered that she had spilled Downey in the car. Although the testimony suggests that Heredia did not believe the explanation, we think the detergent smell in a vehicle owned by her aunt was insufficient to put Heredia on notice that there was a "high probability" that her trip was illegal. *Id*. at 711. Furthermore, although Heredia admitted to worrying that her mother and aunt had undue cash on hand, and that her mother's boyfriend abused drugs, there was no evidence that Heredia knew her aunt, mother, or mother's boyfriend were involved in drug trafficking or that the detergent could be used to mask the odor of marijuana.[2]

[5] If a cherry scent in a vehicle was insufficient to put Baron on notice that he was ferrying drugs for an acquaintance, it was certainly insufficient when Heredia allegedly noticed a perfume scent in her aunt's car that her aunt attri-

---

[2]The dissent offers conjecture upon conjecture about what the jury might or might not have believed. *See*, *e.g.*, Dissent at 14550-51. But the government built its case for a *Jewell* instruction entirely on the credibility of Heredia's statements. The reason the district court erred in giving the *Jewell* instruction is not that the facts offered by the government in support of the instruction were not credible, but that they were insufficient.

The exercise the dissent engages in is not designed to tell us whether Heredia was, in fact, ignorant of her cargo, but avoided acting on her suspicions to provide herself with a defense. Rather, the dissent's conjecture leads to one overriding point — that Heredia "actually knew" she was ferrying marijuana. *See*, *e.g.*, Dissent at 14550, 14551, 14554-55. If the dissent is correct on that point, the government was not entitled to a *Jewell* instruction. *See Sanchez-Robles*, 927 F.2d at 1074-76.

buted to spilled detergent. In such circumstances, something more than a detergent smell is required to prove that Heredia actually suspected that she was involved in criminal activity. On this record, Heredia's alleged "suspicion" was hardly more than a fleeting concern, something more than a random thought but less than a hunch.

B

By her own admission, Heredia actually suspected she might be involved in criminal activity, but the record does not show that she deliberately avoided confirming her suspicion in order to provide herself with a defense. Heredia testified that she began worrying that she might be involved in criminal activity only after she had passed the last interstate exit prior to the checkpoint, and that it was therefore too late to turn back. This is the only evidence in the record on this question; the government failed to provide specific evidence that she actually suspected criminal activity prior to this point. Instead, the government builds its case upon Heredia's testimony: it suggests that she should have pulled off onto the shoulder of the interstate or informed the guards at the check point of her suspicions, and that her failure to take these steps constitutes deliberate ignorance.

In the most literal sense it is true that Heredia could have confirmed or denied her suspicions by pulling off on the side of the interstate and inspecting the car. It is literally true, for example, that Heredia intentionally did not pull over on the shoulder of the interstate. The government has not provided "specific evidence," however, that she failed to stop on the shoulder *in order to provide herself with a defense*, as opposed to not stopping because it was not safe.[3] We doubt

---

[3]We note that district court did not instruct the jury that Heredia must have deliberately avoided learning the truth "in order to provide . . . herself with a defense in the event of prosecution." *Baron*, 94 F.3d at 1318 n.3. The district court relied on the NINTH CIR. MODEL JURY INSTRUCTION

that *Jewell* demands an unsafe act in order to avoid the implication that Heredia deliberately avoided learning the truth.

Permitting a *Jewell* instruction in this case would ignore an essential characteristic of the cases in which we have permitted such instructions. The alleged suspicion in *Jewell* itself arose almost immediately. The defendant was approached by a complete stranger who first offered him marijuana and then offered to pay the defendant to drive the car across the border. *Jewell*, 532 F.2d at 699 n.1. The defendant's friend testified that "it didn't sound right" from the beginning. *Id.* at 699 n.2. Before driving the vehicle, the defendant checked the car over; although he located the secret compartment, he did not try to determine its contents, assuming that the border patrol would not find it. *Id.* The defendant was therefore aware of all the suspect facts before commencing the journey. At the time that his suspicion arose, the defendant had the reasonable opportunity to abstain from the activity that he suspected was criminal. He declined that opportunity not because he was constrained by circumstance, but because he freely and consciously chose to take the risk of liability, believing that his failure to confirm or deny his suspicion would insulate him from liability.

**[6]** Subsequent cases in which we affirmed the use of the *Jewell* instruction have similarly included a reasonable opportunity on the part of the defendants to reverse or abandon their course of conduct once the suspicion had formed. Whether the

5.7, which omits this element in the instruction, although it notes *Baron*'s three-pronged test in the commentary. The element is well-established in our cases, *see Kelm*, 827 F.2d at 1324; *Garzon*, 688 F.2d at 609; *Pacific Hide & Fur*, 768 F.2d at 1098; *Jewell*, 532 F.2d at 699, although it has never been well-developed. It may well be that in the typical case meriting a *Jewell* instruction, it is obvious that the defendant deliberately avoided confirming his suspicions in order to create plausible deniability. This case demonstrates why the element is important and why our model instructions should reflect the three elements described in *Baron*.

drug couriers traveled by air, *see, e.g., Asuncion*, 973 F.2d 769; *Suttiswad*, 696 F.2d 645; automobile, *see, e.g., United States v. McAllister*, 747 F.2d 1273; *United States v. Murrieta-Bejarano*, 552 F.2d 1323 (9th Cir. 1977); or by foot, *see, e.g., Perez-Padilla*, 846 F.2d 1182; *United States v. Lopez-Martinez*, 725 F.2d 471 (9th Cir. 1984), the circumstances that gave rise to the suspicion emerged sufficiently early in the episode that the defendant had the opportunity to change his course of conduct.

**[7]** According to the record, Heredia only became suspicious of criminal activity quite late in her return to Tucson, and shortly before she arrived at the checkpoint. She did not have the opportunity to reverse her course of conduct or to decline to take the trip altogether in the face of her suspicion. By the government's own theory of the case, Heredia had two courses of conduct available to her: abandon her aunt's vehicle on the side of the interstate with another aunt, her mother, and her two infant children either stranded inside or walking with her along the interstate shoulder; or voluntarily report to the Border Patrol agent that although she could now know for sure, she might have just unwittingly participated in a criminal act, and that if she had done so, she had been framed by her own mother and aunt, who presently sat beside her. Neither course of conduct suggested by the government constitutes a reasonable opportunity to abstain from or discontinue the suspected criminal activity such as to warrant a *Jewell* instruction. That is, evidence that Heredia deliberately declined to take either of the above actions does not suggest that she declined to do so for the purpose of providing herself with a defense in the event of prosecution.

**[8]** We have consistently disapproved of issuing the *Jewell* instruction where the government failed to provide specific evidence of deliberate ignorance. *See, e.g., Aguilar*, 80 F.3d at 332 (*Jewell* instruction inappropriate where government concedes that it provided no evidence of willful blindness); *Pacific Hide & Fur Depot, Inc.*, 768 F.2d at 1098 (noting that

government had failed to provide specific evidence of deliberate ignorance, and absent such knowledge, "the jury might impermissibly infer guilty knowledge on the basis of mere negligence without proof of deliberate avoidance."). We do not here hold that the government's evidence was unbelievable, but instead, that it was insufficient to merit a *Jewell* instruction. It is possible that Heredia lied in her testimony, and that the jury could be so persuaded, but arguing that a defendant's testimony is not credible is not the same as providing "specific evidence" to support a *Jewell* instruction. *See Mapelli*, 971 F.2d at 286.

In sum, we decline to impose upon a defendant in these circumstances the legal duty either to place her family in great physical danger or to voluntarily report her suspicions in order to avoid a *Jewell* instruction. We thus hold what our cases have long suggested, that a defendant has not deliberately avoided the truth in order to create a defense unless, at the time the actual suspicion arises, the defendant has the reasonable opportunity to abstain from, or discontinue, the suspected criminal activity. Short of imposing strict liability on persons inadvertently carrying drugs, there is nothing "absurd," Dissent at 14554, in such a requirement. The jury should not be permitted to find a defendant guilty of knowing possession of contraband where the defendant lacked the reasonable opportunity to confirm or deny her suspicion. Indeed, under these circumstances, it is not clear that Heredia's failure to verify her suspicions was even negligence or a reckless disregard for the facts, neither of which is sufficient to warrant a *Jewell* instruction. *Kelm*, 827 F.2d at 1324. Accordingly, we conclude that the government failed to provide specific evidence that Heredia deliberately avoided taking steps to confirm or deny her suspicion in order to provide herself with a defense in the event of prosecution. The district court should not have issued the *Jewell* instruction, and the error is not harmless. *See Sanchez-Robles*, 927 F.2d at 1075.

[9] The dissent argues that any error in offering the *Jewell* instruction was "entirely harmless." because "[t]he evidence

that Heredia actually knew about the drugs in the car was overwhelming." Dissent at 14554. There is the rub. We quite disagree that the evidence was "overwhelming" that Heredia "actually knew" about the marijuana. That is precisely why the government requested a *Jewell* instruction: because the government had insufficient evidence to prove "overwhelming[ly]" who put the marijuana in the trunk or who else knew about it. If, as the dissent postulates, this was "a family business" and "[i]t defies credibility to suggest Heredia was entrusted with 350 pounds of marijuana by a close relative, without being told what she was transporting," Dissent at 14555, then the government should have tried this case straight up. The dissent's theory will surely get the government to the jury; but it will not get the government a *Jewell* instruction. The error was far from harmless.

As we previously observed, there is a great danger in permitting a jury to convict on the basis of deliberate ignorance in the absence of specific evidence: "The effect of a *Jewell* instruction in a case in which no facts point to deliberate ignorance may be to create a presumption of guilt." *Murrieta-Bejarano*, 552 F.2d at 1325. Where the government fails to provide specific evidence of each prong, but the district court nonetheless issues the instruction, a jury "might infer that the defendant possessed 'knowledge' when it would not otherwise have done so." *Id.* If we were to permit the issuance of the *Jewell* instruction absent specific evidence that the defendant ignored the truth in order to provide herself with a defense, the deliberate ignorance doctrine in this circuit would slide perilously close to negligence or even strict liability.

## IV.   CONCLUSION

We conclude that the government failed to provide specific evidence that meets the requirements for a deliberate ignorance jury instruction, and that the district court therefore erred in giving the instruction. Heredia's conviction is accord-

ingly reversed and this case is remanded to the district court for proceedings not inconsistent with this opinion.

**REVERSED and REMANDED**.

---

**KOZINSKI**, Circuit Judge, dissenting:

If ever there was a case where a *Jewell* instruction was proper, this is surely it. This is a much stronger case than *Jewell* itself, or any of our other deliberate ignorance cases, because we have here what we almost never get—defendant's admission that her suspicions were aroused and eventually matured into a belief that there may be drugs in the car. The jury could easily have found that defendant suspected the drugs were there and should have discovered them before trying to run the law enforcement checkpoint.

There are three ways the jury could have done this:

*First*, defendant was aware of a suspicious circumstance— the strong smell of fabric softener or detergent in the car— before she even commenced her trip, yet she failed to check where the odor was coming from. It is true, as the majority points out, that an odor *without more* is not sufficient to support a *Jewell* instruction. *See* maj. at 14540-41 (citing *United States* v. *Baron*, 94 F.3d 1312, 1316-18 (9th Cir. 1996), and *United States* v. *Sanchez-Robles*, 927 F.2d 1070, 1075 (9th Cir. 1991)). The reason for this is simple and well explained by the majority: Not everyone knows that a strong scent is a clue to possible drug smuggling; to make that connection, defendant would have to know that smugglers sometimes use scents to mask drug odors.

Here we have much more than the odor. According to the testimony of the DEA agent who interviewed Heredia, she found the presence of the strong odor—an "overwhelming

scent" according to the Border Patrol agent, Tr. of Trial at 90 (No. CR-02-777-TUC-JMR) (March 11, 2003) [hereinafter March 11 Tr.]—suspicious: "She said she got in the vehicle and the odor was so strong that *something seemed wrong*, so she asked her Aunt Belia about it." Tr. of Trial at 45 (No. CR-02-777-TUC-JMR) (March 12, 2003) [hereinafter March 12 Tr.] (testimony of DEA Agent Birney) (emphasis added). The aunt explained that she had "spilled some detergent in the vehicle a couple of days prior and that was the reason for the smell," but Heredia "didn't believe her aunt . . . . She said that she [Heredia] had spilled detergent in her own vehicle in the past and the smell dissipated within a couple of days and it shouldn't have smelled that strong." *Id.* Despite her suspicion, despite her feeling that "something was wrong," Heredia didn't bother to pop the trunk to check where the odor was coming from.

So far, this is pretty much on all fours with *Jewell*, where the defendant had noted a secret compartment in the vehicle, but failed to look in it, even though his companion stated that "[i]t didn't sound right" from the beginning. *United States* v. *Jewell*, 532 F.2d 697, 699 nn.1 & 2 (9th Cir. 1976) (en banc). Here, Heredia knew of the strong detergent smell, didn't believe her aunt's explanation for it and thought that "something seemed wrong." Why would a strong smell of detergent cause Heredia to suspect that there was something "wrong"? The jury could have inferred that it was because Heredia knew that strong odors are used to mask the smell of concealed drugs.

But we have more than that here. In *Jewell* there was no evidence that the defendant associated the presence of the secret compartment with the concealment of drugs; the *Jewell* court was satisfied that a jury could infer such a connection as a matter of common sense. Here, Heredia disclosed that she *did* associate strong scents in the car with an effort to conceal the smell of contraband. She testified that she eventually figured out that drugs might be in the car, and that she did so

based on a number of clues, two of which were the fact that her mother sprayed the inside of the car with air freshener and that she opened the window, even though it was a cold night. March 12 Tr. at 138-39. Neither opening the window nor the use of air freshener are inherently suspicious; people often open car windows, when they are smoking, and an entire automobile air freshener industry caters to people who wish to mask odors such as cigarette smoke. Certainly, nothing about opening a window or spraying air freshener suggests drug transportation, *unless* one is aware that concealed drugs emit odors that must be covered up or dissipated. To Heredia, however, the use of air freshener and the opening of the window were clues; they told her that there might be drugs in the car.

The jury could have inferred from this testimony that Heredia did have the specialized knowledge that heavy scents are used to cover up drug odors. And, the jury could have reasoned, someone who has that knowledge would infer that the strong odor was put there in order to conceal contraband. This would explain why Heredia didn't accept at face value the aunt's "spilled detergent" story and why it caused her to suspect that "something was wrong."

The inference would be strengthened by the fact that, in her testimony, Heredia twice denied that she had told the agent about the "spilled detergent" incident. March 12 Tr. at 143, 164-65. The jury could have believed the DEA agent that Heredia *did* tell this highly incriminating story the day after her arrest but, recognizing how damaging it was to admit that she suspected something was wrong before she started her trip, she lied about it on the stand.

*Second*, the jury could simply have accepted Heredia's testimony that she came to suspect there were drugs in the car while she was driving on Interstate 19 toward the checkpoint. *Id.* at 138-39, 149-50. Heredia testified that she developed this suspicion based on the fact that her mother and aunt were ner-

vous, that they were drinking and smoking heavily, that her mother sprayed air freshener in the car and opened the window, and that her mother and aunts had plenty of money, even though her mother was not working at the time. *Id.* at 139, 149.

Heredia claims that she did not put these pieces together until she had passed the last freeway exit prior to the checkpoint, but the jury was not bound to believe this. The jury was entitled to believe all of her story, none of her story or part of her story. In particular, we have held, in the *Jewell* context, that the jury is not required to believe defendant's self-serving testimony. *See, e.g.*, *United States* v. *Perez-Padilla*, 846 F.2d 1182, 1183 (9th Cir. 1988) (per curiam); *United States* v. *Nicholson*, 677 F.2d 706, 709 (9th Cir. 1982). *Perez-Padilla* relied on *Nicholson* for this self-evident proposition, and *Nicholson* relied on our earlier case *United States* v. *Cisneros*, 448 F.2d 298 (9th Cir. 1971), where we said:

> A trier of fact is not compelled to accept and believe the self serving stories of vitally interested defendants. Their evidence may not only be disbelieved, but from the totality of the circumstances, including the manner in which they testify, a contrary conclusion may be properly drawn.

*Id.* at 305 (*quoted in Nicholson*, 677 F.2d at 709).

The jury here was entitled to accept as true the *fact* of Heredia's epiphany—which was contrary to her interest, and therefore likely to be true—but disbelieve her as to the *timing* of that realization. Indeed, as *Cisneros* makes clear, the jury could properly draw precisely the *opposite* inference from her testimony—i.e. that she figured out there were drugs in the car long before the point of no return.

The majority's figment that the jury was somehow bound to believe Heredia on this key point not only conflicts with

*Nicholson*, it creates a very dangerous precedent. Jurors are not Immigration Judges; we have traditionally given them wide latitude whether to believe or disbelieve evidence: "The jury may conclude a witness is not telling the truth as to one point, is mistaken as to another, but is truthful and accurate as to a third." *Elwert* v. *United States*, 231 F.2d 928, 934 (9th Cir. 1956). This makes perfect sense: As we are all aware, witnesses seldom tell an entirely false story; it is very common for witnesses to try to gain the trier of fact's trust by hewing as closely as possible to the truth, but then add a fact or explanation that casts their conduct in a positive light. This additional fact or explanation is sometimes true, but often it's not. Juries, employing their common sense, as they are instructed to do, understand this, and thus may reject the exculpatory or self-serving portion of a witness's story, even as they accept the rest.

The jury here could reasonably have rejected the exculpatory part of Heredia's story. According to the record, the trip from Nogales to the checkpoint took some 90 minutes. *See* March 11 Tr. at 83; March 12 Tr. at 136. Given the evidence that Heredia was aware that there was "something wrong" as soon as she took possession of the car, that her suspicions about her mother's finances long preceded the trip, March 12 Tr. at 139 ("I would always ask myself where she got the money."); *id.* at 149 ("[M]y mom and my aunts—they always had money, but my mom wasn't working at the time."), and that the detergent smell in the car was "overwhelming," the jury could have found that Heredia developed her suspicions long before she got to the checkpoint, yet chose not to investigate so she could later claim that she didn't know there were drugs in the car.

*Finally*, even if the jurors believed every jot and tittle of Heredia's story, they could still have concluded that she failed to take reasonable steps to disassociate herself from the criminal conduct before the drugs were discovered by the Border Patrol. The government suggest two ways she might have

done this. She might, first of all, have stopped the car and pulled to the side of the road. The majority rejects this possibility on the theory that this would have been "an unsafe act." Maj. at 14544. According to the majority, doing so would have required Heredia to "abandon her aunt's vehicle on the side of the interstate with another aunt, her mother, and her two infant children either stranded inside or walking with her along the interstate shoulder . . . ." *Id.* at 14545. Nothing of the sort. Cars occasionally have mechanical problems and are forced to pull over and await help; this is a normal part of highway driving, and most motorists experience it from time to time. Motorists also stop on highway shoulders to check unexplained vehicle noises, batten down loose cargo, water the tumbleweeds, let the engine cool on a steep uphill grade and for dozens of similar reasons. Shoulders are built alongside highways precisely to allow motorists to stop safely in case of urgent need.

Once Heredia stopped the car on the shoulder, she would neither have been stranded, nor had to hike. Instead, she could have checked the trunk and, if there was nothing there, she could have continued her trip. If, on the other hand, she found contraband—as she certainly would have—she could have used her mother's cell phone, *see* March 12 Tr. at 140, to summon her husband to fetch her and her passengers. But Heredia had an even better alternative: According to her own testimony, Aunt Belia was traveling in close proximity to them in a separate car—a maroon Cavalier. *Id.* When Heredia realized that she might be carrying drugs, she could have signaled her aunt visually (or instructed her by cell phone) to pull over, and transferred the occupants of Heredia's car to Belia's. When two cars caravan, as happened here, it seems perfectly safe and appropriate to switch vehicles when, for whatever reason, one of the vehicles can no longer be driven safely—that's often the very reason cars travel in tandem. My colleagues' scenario of three vulnerable women hiking on the shoulder of a busy interstate while carrying little children is pure fantasy.

Alternatively, Heredia could have proceeded to the check-point and informed the border agents of her suspicions. The majority rejects this possibility out of hand, maj. at 14545, but I have no clue why the majority doesn't consider this a "reasonable opportunity to abstain from, or discontinue, the suspected criminal activity." *Id.* at 14546. What better way to discontinue suspected criminal activity than by reporting it to the police? By voicing her suspicions, Heredia wouldn't have admitted guilt; she would have proclaimed her innocence and distanced herself from the criminal conduct. And, by spilling the beans, she would have unequivocally disassociated herself from the criminal enterprise; indeed, by calling attention to the possibility that drugs were present, she would have ensured that the car would be searched and that any criminal enterprise to which she had unwittingly become a party would be thwarted.

Instead, Heredia played possum when she was stopped at the checkpoint. By doing so, she continued to aid the criminal enterprise even though she suspected she was carrying drugs. Had the Border Patrol agents been less alert, she might well have rolled past the checkpoint and delivered her valuable cargo safely to its unlawful destination. I can't imagine why my colleagues believe that *Jewell* entitles an individual who suspects she has unwittingly become entangled in criminal activity to continue abetting the criminal enterprise and helping ensure its success. I find this proposition perfectly absurd.

Finally, even where a *Jewell* instruction is improperly given, the court must engage in harmless error analysis, and a number of our cases have found the erroneous giving of a *Jewell* instruction harmless. *See, e.g.*, *United States* v. *Fulbright*, 105 F.3d 443, 447 (9th Cir. 1997); *United States* v. *Alvarado*, 838 F.2d 311, 316-17 (9th Cir. 1988). The majority seems to recognize this, maj. at 14546, but concludes the error is not harmless, citing another case—*Sanchez-Robles*, 927 F.2d at 1075. But the fact that the error was found prejudicial in another case tells us nothing about whether the error is

prejudicial here. This is because harmless error analysis requires a review of *this* record, to determine whether *this* defendant would nevertheless have been convicted, had *this* error not been committed. By purporting to conduct harmless error analysis in the abstract, without looking at the record or discussing the evidence, the majority contradicts a long line of authority, turning a *Jewell* error into structural error.

It's clear that if there was *Jewell* error here—which there was not—it was entirely harmless. The evidence that Heredia actually knew about the drugs in the car was overwhelming. Unlike many other cases involving drug couriers, everyone here who might have planted the drugs was Heredia's close relative—her husband, her mother, her aunts. While a mule might plausibly claim he was not told what he was carrying, this was a family business. It defies credulity to suggest that Heredia was entrusted with 350 pounds of marijuana by a close relative, without being told what she was transporting. I can't imagine that the jury would have been fooled by the self-contradictory and confused stories told by Heredia and her various family members. On this record, I have no trouble concluding that any *Jewell* error is harmless beyond a reasonable doubt. I would affirm.