# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued September 13, 2005 — Decided January 27, 2006
Reissued March 17, 2006

No. 04-3095

UNITED STATES OF AMERICA,
APPELLEE

v.

LOIS A. ALSTON-GRAVES, A/K/A LOIS AUSTIN,
APPELLANT

---

Appeal from the United States District Court
for the District of Columbia
(03cr00045-02)

---

*W. Douglas Wham*, appointed by the court, argued the cause and filed the briefs for appellant.

*Chrisellen R. Kolb*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were *Kenneth L. Wainstein*, U.S. Attorney, and *John R. Fisher* and *Thomas J. Tourish, Jr.*, Assistant U.S. Attorneys.

Before: RANDOLPH and ROGERS, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* RANDOLPH.

2

RANDOLPH, *Circuit Judge*: This appeal from convictions on charges of conspiracy and wire fraud raises questions about a "willful blindness" jury instruction on knowledge. The instruction allowed the jury to find that the defendant acted knowingly if she deliberately closed her eyes to obvious facts. Questions about the propriety of such an instruction and the circumstances when it may be given have frequently been the subject of opinions in the other circuits, but have received little attention in this court. The appeal also presents an issue regarding sentencing in light of *United States v. Booker*, 125 S. Ct. 738 (2005).

## I.

The indictment charged John H. Smith, Gwendolyn C. Jones, and Lois A. Alston-Graves with conspiracy to commit wire fraud, 18 U.S.C. § 371, and wire fraud, 18 U.S.C. § 1343, in connection with a scheme to defraud finance companies in Florida, Colorado, and the District of Columbia. Smith, Jones, and Alston-Graves allegedly carried out a scheme to induce lenders into making "factoring" loans to Accurate Computer Technicians, Inc. ("ACT"), a D.C. corporation Smith founded that was "supposed to . . . build computers and repair computers," but by his own admission "didn't do anything."

A "factoring" loan is a short-term commercial loan provided to a company in need of cash to perform a contract – in this case, a government contract. The amount loaned is a percentage of the money due from the government on outstanding invoices. In exchange for the loan, the company assigns to the factoring company the proceeds due on the contract. When a company applies for such a loan, the factoring company verifies that the contract exists, that the work is being performed, and that the government will assign the proceeds of the invoice. The views of the government officer who

administers the contract and authorizes payment are obviously of critical importance to the prospective lender. The factoring company also verifies with the government's disbursing officer that the government will pay the factoring company. Upon receiving the assigned proceeds, the factoring company keeps an amount equal to the loan plus a fee based on a percentage of the invoice amount.

Smith pled guilty to conspiracy and testified for the government at the first trial. A jury acquitted Jones and convicted Alston-Graves on both counts. The district court set aside Alston-Graves's conviction and the government retried her. The evidence at the second trial, viewed in favor of the government, *United States v. Butler*, 924 F.2d 1124, 1126 (D.C. Cir. 1991), showed as follows.

In July 1997, Smith filled out an invitation for bids issued by the District of Columbia on a computer-related contract. The paperwork was not something with which Smith was familiar. He soon decided to use the government contracting process to make money illegally. Smith consulted a person in his neighborhood with known expertise in shady dealings. The individual gave Smith the telephone number of Alston-Graves, who was employed in the District's child support enforcement division at the time. Smith called her, invoked the individual's name, and asked for her help with a "fake contract." Alston-Graves, suspicious of Smith, asked him to fax a copy of his driver's license, which he did. A few days later Smith and Alston-Graves met. Smith showed her an ACT contract with the District, saying it was fake and asking her for help in making money with it. Alston-Graves agreed to pose as the government contracting officer and told Smith to make a phony invoice and "shop it around" to finance companies. In return, she demanded twenty-five percent of the profits from the scheme.

At a second meeting in late summer 1997, Alston-Graves gave Smith "a certificate of award, a recommendation of award, payment schedule, and some blank government letterhead." She instructed Smith to fill out the portions for the offeror and sign the relevant documents. Smith then used the paperwork to convince potential investors to provide $5000 in loans to his company. In addition to showing the investors "all the paperwork" Alston-Graves had given him, Smith showed them two fake checks. The checks, which Alston-Graves prepared, purported to be partial payments on the contract. In a conference call with the investors, Alston-Graves acted the part of a government contracting officer and gave assurances that "the contract was real." After Smith received the $5000 in checks, Alston-Graves asked him to come to her house to cash the checks. Smith complied, and they cashed the checks at a nearby liquor store. Smith gave Alston-Graves $2500 to $3000, which was the amount she demanded.

Around October or November 1997, Smith called Paragon Financial Group, Inc., a Florida finance company engaged in factoring. Smith – who identified himself as the Chief Operating Officer of ACT – dealt with Jon Anselma, a Paragon partner. Among the documents Smith provided to Anselma were invoices listing "Lois Austin" – Alston-Graves's alias – as the contracting officer. Smith convinced Anselma that ACT had a five-year contract with the District of Columbia for $1 million annually. Smith began sending invoices to Anselma, who said he would need signatures from the government contracting officer – "Lois Austin" – and the disbursing officer. Gwendolyn Jones then pretended to be the District's disbursing officer, using the name "Mary Ann Whitaker"; Jones demanded $5000 from Smith for her services. Alston-Graves stayed in touch with Anselma by telephone, confirming that she was the District's contracting officer, that the contract existed, that ACT was performing under the contract, and that the disbursing officer

would soon approve payment. These confirmations were crucial. Anselma testified that Paragon "would not [have loaned] money on the invoice had [Alston-Graves] not verified the contract, and the assignment, and the invoice." Alston-Graves also told Anselma about $120,000 monthly payouts to ACT for computer services. Anselma asked Smith for correct copies of certified invoices, a written amendment to the contract reflecting the monthly payouts, and a completed assignment of the proceeds.

Smith eventually forwarded to Anselma all the documents he needed, as well as copies of a worksheet reflecting the authorized work completed on the contract and two invoices signed by "Lois Austin" reflecting the $120,000 monthly payouts to ACT. Anselma testified that in reviewing these papers, he thought Lois Austin's signatures "looked a little bit different from each other" and "was concerned that [the signatures were] forged." When he called Alston-Graves about this, she assured him that she had signed the papers and said it was not necessary for him to fax them for her confirmation. Anselma insisted. After receiving the documents Alston-Graves told Anselma that "they were, indeed, her signatures on the invoices." Paragon then confirmed with Whitaker (i.e., Gwendolyn Jones) that the invoices "were being processed for payment and Paragon was scheduled to be paid," and independently confirmed that ACT was a corporation in good standing in D.C. In early February 1998, Paragon wired $83,740 to ACT. Smith used part of the money to repay ACT's investors and to pay Alston-Graves $5000.

Anselma testified that when the certified letters he had mailed to Mary Ann Whitaker and Lois Austin returned to Paragon in early March, he phoned Alston-Graves to inquire when Paragon would be paid on the invoice. She told him the "contract had been cancelled," to which he replied that he "knew

the contract was bogus." At this, Alston-Graves "suddenly . . . got nervous and denied ever talking to [Anselma]." She asked him "who [he] was and said she had no idea what [he] was talking about." Paragon never received its money under the fake contract assignment.

Meanwhile, the conspirators attempted to carry out two other frauds. In November 1997, Smith began the same scam anew, this time with Norwest Business Credit, a Colorado finance company. Smith sent Norwest the same documents he had sent Paragon: "the certificate, award of certificate, the memorandum, and the recommendation for award," as well as phony October and November invoices. When Smith told Alston-Graves he "had gotten in contact with Norwest," she was pleased and said "[s]he would pose as a contracting officer." She told Smith to "get as much money as possible."

Smith called Cynthia Lynn Anderson of Norwest in January 1998, identifying himself as the CEO of ACT, Inc. and telling her he "had a government contract" that he wanted Norwest to factor. During that conversation, Anderson conveyed some concerns regarding the paperwork Smith had sent. When she challenged him about the paperwork, he told her to call "Lois Austin," the "contracting officer." Anderson called Alston-Graves "[i]mmediately" to ask her to verify the invoices Smith had sent. Alston-Graves made three comments that troubled Anderson. Without hesitation, Alston-Graves indicated that ACT "was a great company" and had "[d]one a very, very good job." It surprised Anderson that Alston-Graves, who purported to be part of a large government organization, would be so familiar with ACT. Alston-Graves also said the money was ready to be wired to Norwest, which was troubling for two reasons: first, because Anderson had never conveyed Norwest's wiring information, and, second, because ACT had no reason to

pursue a loan from Norwest if the money was ready to be sent. Norwest ultimately declined ACT's loan application.

Smith and Alston-Graves attempted an identical scheme with Prinvest, a finance company based in Washington, D.C. This was their largest attempted fraud – they sought a loan of $1 to $5 million based on a bogus $240 million contract. The Prinvest fraud began in late 1997 when Alston-Graves gave Smith a fake contract with instructions to "shop it around" and "get as much money as possible." She also told him to "identify her as a contracting officer." Smith called Prinvest and spoke with George Hajimihalis. When Hajimihalis called Alston-Graves, she identified herself as "the contracting officer that had awarded th[e] contract," confirmed the amount, and confirmed that the contract "had been awarded to Mr. Smith." Despite these confirmations, Hajimihalis's supervisor declined the application.

In addition to the foregoing evidence, the government introduced Alston-Graves's testimony from the first trial. By Alston-Graves's account, Smith contacted her through a mutual friend, and she later spoke with Smith and his mother in Smith's car while it was parked in Alston-Graves's driveway. Smith's mother pled for her son's life, telling Alston-Graves that Smith's life was in danger because he owed money to "some Italian Mafia people," that she (Smith's mother) already had refinanced her home, and that they needed Alston-Graves's help. In Alston-Graves's version of the story, Smith showed her a contract bearing ACT's logo and indicating ACT owed $60,000. He explained that he needed a place to cash some business checks after hours. Alston-Graves took him to the liquor store where she succeeded in cashing the checks. Smith then handed her $3000 of the proceeds.

Alston-Graves maintained that she simply did a few favors for Smith, primarily giving to inquiring callers "some letters and numbers" Smith had provided her. She denied knowing what the letters and numbers were for – bank accounts or similar financial information related to his debts, she thought. While she admitted posing as ACT's contracting officer, she claimed that she never pretended to be a government contracting officer. Alston-Graves said she never knew what ACT did or what the contracts were for and certainly did not know that Smith was defrauding lenders. She stopped helping Smith because the telephone calls during working hours were interfering with her job.

In response to the government's evidence, Alston-Graves presented several witnesses, including a forensic document examiner and Gwendolyn Jones. The document examiner testified that the documents allegedly signed by Alston-Graves in the name "Lois Austin" "were not prepared in the normal handwriting of Lois Alston-Graves," and that "in all likelihood she did not prepare the[] signatures." However, he could not rule out the possibility that she disguised her handwriting. Gwendolyn Jones's testimony corroborated some portions of Alston-Graves's account. Like Alston-Graves, Jones agreed – at John Smith's request – to give numbers to a man who would call looking for them. She agreed to do this after Smith "led [her] to believe that someone was trying to kill him" because he "owed them money." For fear that the person threatening Smith's life might threaten her life too, Jones chose the alias Mary Ann Whitaker. Jones admitted speaking with Anselma of Paragon – she thought he was a loan shark. But she said she had not heard of ACT until being questioned by investigators in this case. Jones said she and Alston-Graves were friends and had known each other for eight years.

At the government's urging the district court not only gave the standard charge on "knowingly," but also gave a "willful blindness" charge:

When the word "knowingly" or the phrase "the defendant knew" is used in these instructions, it means that the defendant realized what she was doing and was aware of the nature of her conduct and did not act through ignorance, mistake or accident.

The government may prove that the defendant acted "knowingly" by proving, beyond a reasonable doubt, that this defendant deliberately closed her eyes to what would otherwise have been obvious to her. No one can avoid responsibility for a crime by deliberately ignoring what is obvious. A finding beyond a reasonable doubt of an intent of defendant to avoid knowledge or enlightenment would permit the jury to find knowledge. Stated another way, a person's knowledge of a particular fact may be shown from a deliberate or intentional ignorance or deliberate or intentional blindness to the existence of that fact.

It is, of course, entirely up to you as to whether you find any deliberate ignorance or deliberate closing of the eyes and any inferences to be drawn from any such evidence. You may not conclude that defendant had knowledge, however, from proof of a mistake, negligence, carelessness, or a belief in an inaccurate proposition.

## II.

The main issue is whether the district court erred in giving the willful blindness instruction contained in the last two paragraphs above.

Both of the counts on which the jury found Alston-Graves guilty required the government to prove that she acted knowingly. The elements of the conspiracy offense were that she entered into an agreement with Smith to commit wire fraud, that she knowingly participated in the conspiracy with the intent to commit wire fraud, and "'that at least one overt act was committed in furtherance of the conspiracy.'" *United States v. Mellen*, 393 F.3d 175, 180-81 (D.C. Cir. 2004) (quoting *United States v. Gatling*, 96 F.3d 1511, 1518 (D.C. Cir. 1996)). The elements of the wire fraud offense were that she knowingly and willingly entered into a scheme to defraud and that an interstate wire communication was used to further the scheme. *See, e.g.*, *United States v. Maxwell*, 920 F.2d 1028, 1035-36 (D.C. Cir. 1990).

The evidence supporting Alston-Graves's conviction on both counts, and particularly the evidence that she acted knowingly, was overwhelming. Viewed in the light most favorable to the government, the evidence showed that Alston-Graves assisted Smith in fraudulently obtaining, and in attempting to obtain, money from multiple finance companies; that she adopted an alias – "Lois Austin" – to accomplish this; that she falsely posed as a government contracting officer; that in telephone conversations from her District government office she falsely represented to finance company officers that ACT was performing contracts with the District, for which it had earned substantial sums; that she prepared false documents, which Smith then sent to the finance companies; and so forth.

Why in the face of this mountain of evidence the prosecution sought, and the district court gave over a defense objection, a willful blindness instruction is difficult to fathom. The instruction, although taken from pattern jury instructions, 1A KEVIN F. O'MALLEY ET AL., FEDERAL JURY PRACTICE AND JURY INSTRUCTIONS, CRIMINAL § 17.09, at 653 (5th ed. 2000),

is problematic.  The district court first correctly told the jury that "the word 'knowingly' . . . means that the defendant realized what she was doing and was aware of the nature of her conduct and did not act through ignorance, mistake or accident."  *E.g.*, *United States v. Graham*, 431 F.3d 585, 590 (7th Cir. 2005) (quoting COMMITTEE ON FEDERAL CRIMINAL JURY INSTRUCTIONS FOR THE SEVENTH CIRCUIT, PATTERN CRIMINAL FEDERAL JURY INSTRUCTIONS FOR THE SEVENTH CIRCUIT § 4.06 (1998), *available at* http://www.ca7.uscourts.gov/Rules/pjury .pdf); *accord United States v. Mercado*, 412 F.3d 243, 250-52 (1st Cir. 2005); *United States v. Sinskey*, 119 F.3d 712, 715 (8th Cir. 1997).  The court then instructed that "a person's knowledge of a particular fact may be shown from a deliberate or intentional ignorance or deliberate or intentional blindness to the existence of that fact."  It makes obvious sense to say that a person cannot act "knowingly" if she does not know what is going on.  To add that such a person nevertheless acts "knowingly" if she intentionally does not know what is going on is something else again.[1]

---

[1] *United States v. Jewell*, 532 F.2d 697, 700-04 (9th Cir. 1976) (en banc), one of the more frequently cited willful blindness cases, upheld an instruction that the defendant acted knowingly if his ignorance resulted from his conscious decision "to avoid learning the truth."  Commenting on the case, Husak and Callender state that

> [l]iability was not predicated on a finding of knowledge, but rather on a particular explanation of why the defendant remained ignorant.  But it is hard to see how ignorance, from whatever cause, can be knowledge.  A particular explanation of why a defendant remains ignorant might justify treating him as though he had knowledge, but it cannot, through some mysterious alchemy, convert ignorance into knowledge.

Douglas N. Husak & Craig A. Callender, *Wilful Ignorance, Knowledge, and the "Equal Culpability" Thesis: A Study of the*

Yet in the federal courts, willful blindness instructions – sometimes called "deliberate ignorance" or "conscious avoidance" or "ostrich" instructions – are now commonly given and commonly upheld. All of the other circuits with criminal jurisdiction have approved such instructions for a wide range of criminal offenses,[2] although the courts' rationales vary,[3] as do

_____

*Deeper Significance of the Principle of Legality*, 1994 WIS. L. REV. 29, 52 (footnote omitted).

[2] Some of the more recent decisions are: *United States v. Freeman*, No. 04-30037, 2005 WL 3525612, at *5-6 (5th Cir. Dec. 23, 2005) (conspiracy, 18 U.S.C. § 371; wire fraud, 18 U.S.C. § 1343; travel fraud, 18 U.S.C. § 2314; and money laundering, 18 U.S.C. § 1957); *United States v. Arias*, 431 F.3d 1327, 1335 (11th Cir. 2005) (conspiracy, 18 U.S.C. § 371); *United States v. Epstein*, 426 F.3d 431, 440-41 (1st Cir. 2005) (mail fraud, 18 U.S.C. § 1341); *United States v. Wasserson*, 418 F.3d 225, 237-39 (3d Cir. 2005) (improper disposal of hazardous waste, 42 U.S.C. § 6928(d)); *United States v. Zedner*, 401 F.3d 36, 50-51 (2d Cir. 2005) (bank fraud, 18 U.S.C. § 1344); *United States v. Sdoulam*, 398 F.3d 981, 993-95 (8th Cir. 2005) (chemical distribution with reason to believe it would be used to manufacture methamphetamine, 21 U.S.C. § 841(c)); *United States v. Jaffe*, 387 F.3d 677, 681 (7th Cir. 2004) (wire fraud, 18 U.S.C. § 1343); *United States v. Carney*, 387 F.3d 436, 448-49 (6th Cir. 2004) (firearms transactions violations, 18 U.S.C. §§ 922, 924); *United States v. Collins*, 372 F.3d 629, 634 (4th Cir. 2004) (money laundering, 18 U.S.C. § 1956); *United States v. Soussi*, 316 F.3d 1095, 1106-07 (10th Cir. 2002) (unlawful exportation of goods, 50 U.S.C. §§ 1702, 1705); *United States v. Shannon*, 137 F.3d 1112, 1117-18 (9th Cir. 1998) (interference with commerce by threatened physical violence, 18 U.S.C. § 1951; mailing a threatening communication, 18 U.S.C. § 876).

Some criminal statutes on their face require that a defendant act "knowingly" to be guilty. *E.g.*, 18 U.S.C. § 152 (concealment of assets in bankruptcy); *id.* § 1344 (bank fraud). Other criminal statutes

the wording of the instructions[4] and the limits on the doctrine's proper use.[5]

---

– like those Alston-Graves was convicted of violating – require knowledge as a result of judicial interpretation, not statutory text. *E.g.*, *id.* § 371 (conspiracy); *id.* § 1343 (wire fraud). Courts reviewing convictions premised on willful blindness do not seem to draw this distinction.

[3] One rationale is that a defendant who deliberately remains ignorant is just as culpable as a defendant who is fully informed. *Jewell*, 532 F.2d at 700. Another is that "criminal recklessness . . . is the legal equivalent of knowledge." *United States v. Ramsey*, 785 F.2d 184, 189 (7th Cir. 1986). Still another is that "one 'knows' facts of which he is less than absolutely certain. To act 'knowingly,' therefore, is not necessarily to act only with positive knowledge, but also to act with an awareness of the high probability of the existence of the fact in question." *United States v. Graham*, 739 F.2d 351, 353 (8th Cir. 1984); *see also United States v. Adeniji*, 31 F.3d 58, 62 (2d Cir. 1994) ("The rationale for the conscious avoidance doctrine is that a defendant's affirmative efforts to 'see no evil' and 'hear no evil' do not somehow magically invest him with the ability to 'do no evil.'") (internal quotation marks omitted).

[4] *See, e.g.*, *Sdoulam*, 398 F.3d at 993 n.8; *United States v. Mari*, 47 F.3d 782, 784-85 (6th Cir. 1995); *United States v. Manriquez Arbizo*, 833 F.2d 244, 248 (10th Cir. 1987); *Ramsey*, 785 F.2d at 190-91.

[5] Some of the more recent decisions are: *Freeman*, 2005 WL 3525612, at *5 (permitting "deliberate indifference" instruction when "(1) the defendant was subjectively aware of a high probability of the existence of illegal conduct; and (2) the defendant purposely contrived to avoid learning of the illegal conduct") (quoting *United States v. Scott*, 159 F.3d 916, 922 (5th Cir. 1998)); *United States v. Heredia*, 429 F.3d 820, 824 (9th Cir. 2005) ("[T]he instruction is 'rarely appropriate,' and should be given only when the government presents 'specific evidence' that the defendant '(1) actually suspected that he

The trend in favor of allowing a willful blindness instruction may have been accelerated by a 1962 proposed draft of the Model Penal Code, which has since become official. The Code defines knowledge of a fact to include a situation in which "a person is aware of a high probability of [the fact's] existence, unless he actually believes that it does not exist." MODEL PENAL CODE § 2.02(7) (Official Draft and Revised Comments 1985). The Commentary explains that this definition was designed for "the case of the actor who is aware of the probable existence of a material fact but does not determine whether it exists or does not exist." *Id.* § 2.02 cmt. 9. As Judge Friendly put it, "[t]his received at least nodding approval in *Leary v. United States*, 395 U.S. 6, 46 n.93 (1969) and perhaps more than

---

or she might be involved in criminal activity, (2) deliberately avoided taking steps to confirm or deny those suspicions, and (3) did so in order to provide himself or herself with a defense in the event of prosecution.'") (quoting *United States v. Baron*, 94 F.3d 1312, 1318 n.3 (9th Cir. 1996)); *Sdoulam*, 398 F.3d at 993 ("'A deliberate ignorance instruction is appropriate when the defendant asserts a lack of guilty knowledge, but the evidence supports an inference of deliberate ignorance.'") (quoting *United States v. Hildebrand*, 152 F.3d 756, 764 (8th Cir. 1998)); *United States v. Espinoza*, 244 F.3d 1234, 1242 (10th Cir. 2001) (permitting use of "deliberate ignorance" instruction "'only when the prosecution presents evidence that the Defendant purposely contrived to avoid learning all the facts in order to have a defense in the event of a subsequent prosecution'") (quoting *United States v. Hanzlicek*, 187 F.3d 1228, 1233 (10th Cir. 1999)); *United States v. Ferrarini*, 219 F.3d 145, 154 (2d Cir. 2000) (permitting "conscious avoidance" instruction only if: (1) "the defendant asserts the lack of some specific aspect of knowledge required for conviction," and (2) "'the evidence is such that a rational juror may reach [the] conclusion beyond a reasonable doubt . . . . that [the defendant] was aware of a high probability [of the fact in dispute] and consciously avoided confirming that fact'") (quoting *United States v. Rodriguez*, 983 F.2d 455, 458 (2d Cir. 1993)) (alterations in original).

that in *Turner v. United States*, 396 U.S. 398, 416 & n.29 (1970), although in neither case did the trial judge use the definition in a charge." *United States v. Jacobs*, 475 F.2d 270, 287 (2d Cir. 1973) (citations altered). Judge Friendly was understandably reluctant to attribute too much to the Supreme Court's mention of the Model Penal Code's definition of knowledge. The Court never cited the Commentary, which explained the purpose of the definition. And the definition's "high probability" qualification, standing alone, could be taken to mean simply that knowledge need not entail absolute certainty. "To demand that a proposition be certain in order to be known . . . would severely restrict the extent of our knowledge, perhaps to the vanishing point." THEODORE SCHICK, JR. & LEWIS VAUGHN, HOW TO THINK ABOUT WEIRD THINGS: CRITICAL THINKING FOR A NEW AGE 100 (1995).

In this court, *United States v. Gallo*, 543 F.2d 361, 367 (D.C. Cir. 1976), quoted Judge Friendly's opinion in *Jacobs* with approval and held that 18 U.S.C. § 2314 – which criminalizes transporting stolen property "knowing the same to have been stolen" – does not require proof of the defendant's "actual knowledge." By this *Gallo* seems to have meant that circumstantial evidence of the defendant's knowledge that the property was stolen would suffice. The court added: "It may be true in a given case, such as where the notice was clear and was wilfully ignored, that evidence of such facts may be considered by the jury as *part* of the proof that an accused possessed the requisite knowledge." *Gallo*, 543 F.2d at 367 (emphasis added). In reversing the conviction, *Gallo* suggested "[f]or possible use on remand" an instruction "based on the charge given and approved in [*Jacobs*]." *Id.* at 368-69 & 368 n.6 (citing *Jacobs*, 475 F.2d at 287 n.37). Part of that suggested instruction states that guilty knowledge "may be satisfied by proof that the defendant deliberately closed his eyes to what otherwise would have been obvious to him." *Id.* at 368 n.6.

In *United States v. Mellen*, 393 F.3d 175 (D.C. Cir. 2004), our only other opinion addressing the matter, we reviewed the sufficiency of the evidence supporting the defendant's conviction for receipt of stolen government property. Although a willful blindness instruction had been given to the jury, Mellen did not challenge his conviction on that basis. Nevertheless, after finding "ample evidence" showing that Mellen "knew . . . the[] goods were stolen," we stated in dicta that "guilty knowledge" may be shown by proof "that, when faced with reason to suspect he is dealing in stolen property, the defendant consciously avoided learning that fact." *Id.* at 181. For the latter proposition we cited *United States v. Reyes*, 302 F.3d 48, 54-55 (2d Cir. 2002). *Reyes*, on the pages cited, summarized the law of the Second Circuit regarding willful blindness instructions in conspiracy cases.[6]

One problem with the various formulations of this instruction is that the jury might convict a defendant for acting recklessly[7] – a problem the drafters of the Model Penal Code

---

[6] The *Reyes* court stated that in a conspiracy case, "the jury may use the conscious avoidance doctrine to establish the defendant's knowledge of the aims of the conspiracy but . . . may *not* use it to establish the defendant's intent to participate in the conspiracy." 302 F.3d at 55. The Second Circuit may have retreated from this proposition, which it later described as "pure dictum." *United States v. Svoboda*, 347 F.3d 471, 478 (2d Cir. 2003).

[7] *See* Robin Charlow, *Wilful Ignorance and Criminal Culpability*, 70 TEX. L. REV. 1351, 1382-90 (1992) (comparing willful ignorance to knowledge and recklessness and concluding that "most definitions of wilful ignorance delineate a mens rea that is the equivalent neither of knowledge nor recklessness"); Ira P. Robbins, *The Ostrich Instruction: Deliberate Ignorance as a Criminal Mens Rea*, 81 J. CRIM. L. & CRIMINOLOGY 191, 220-27 (1990) (discussing the similarity of willful blindness to recklessness and arguing that the

recognized[8] – or even for acting negligently.[9] Negligence and recklessness are not the same as intentional and knowing conduct. We have held in a civil context that a defendant acts with extreme recklessness if he "encountered 'red flags,' or 'suspicious events creating reasons for doubt' that should have alerted him to the improper conduct." *Howard v. SEC*, 376 F.3d 1136, 1143 (D.C. Cir. 2004) (quoting *Graham v. SEC*, 222 F.3d 994, 1006 (D.C. Cir. 2000)). Yet willful blindness instructions have been justified when "record evidence reveals 'flags' of suspicion that, uninvestigated, suggest willful blindness." *United States v. Epstein*, 426 F.3d 431, 440 (1st Cir. 2005) (quoting *United States v. Coviello*, 225 F.3d 54, 70 (1st Cir. 2000)); *see also United States v. Craig*, 178 F.3d 891, 898 (7th Cir. 1999) (affirming conviction based on willful blindness because defendant "saw and experienced enough suspicious

---

Model Penal Code "has merely renamed recklessness with respect to existing facts in order to reach the deliberately ignorant defendant").

[8] *See* MODEL PENAL CODE § 2.02 cmt. 9.

[9] *E.g.*, *United States v. Del Aguila-Reyes*, 722 F.2d 155, 157 (5th Cir. 1983) ("From these suspicious facts, it was reasonable for the jury to infer that Del Aguila-Reyes should have known that his trip to Miami was prompted for some additional, probably illegal, reason."); *see also Jewell*, 532 F.2d at 707 (Kennedy, J., dissenting) ("The failure to emphasize, as does the Model Penal Code, that subjective belief is the determinative factor, may allow a jury to convict on an objective theory of knowledge that a reasonable man should have inspected the car and would have discovered what was hidden inside."); Robbins, *supra* note 7, at 227-29 (arguing that even though "[b]oth prongs of the Model Penal Code formulation protect the defendant from conviction for merely negligent behavior. . . . trial judges and reviewing courts often give or approve jury instructions that . . . eliminat[e] even the minimal safeguards that these provisions afford").

activities to raise several red flags," which "supports an inference that she consciously chose not to pursue the truth").

For all these reasons, many of the courts of appeals admonish that "[c]aution is necessary in giving a willful blindness instruction." *United States v. Cassiere*, 4 F.3d 1006, 1023 (1st Cir. 1993). Some say that such an instruction is "rarely appropriate,"[10] or only proper in "rare circumstances"[11] or "rare cases."[12] Others are "wary of giving a willful blindness instruction,"[13] or advise that the instruction be given only "sparingly."[14]

We began this discussion by wondering why, in light of the evidence, a willful blindness instruction was even given in this case. The only defense objection at trial was to the lack of an evidentiary predicate for the instruction. Now that the case is on appeal, Alston-Graves also complains about the wording of the instruction and its use in a conspiracy prosecution. As to these complaints, we could reverse only if the district court committed plain error. *United States v. Thompson*, 279 F.3d 1043, 1049

---

[10] *Heredia*, 429 F.3d at 824; *United States v. de Francisco-Lopez*, 939 F.2d 1405, 1409 (10th Cir. 1991).

[11] *United States v. Ruhe*, 191 F.3d 376, 385 (4th Cir. 1999); *accord United States v. Mendoza-Medina*, 346 F.3d 121, 132 (5th Cir. 2003); *Espinoza*, 244 F.3d at 1242.

[12] *United States v. Concha*, 233 F.3d 1249, 1252 (10th Cir. 2000); *United States v. Prather*, 205 F.3d 1265, 1270 (11th Cir. 2000).

[13] *United States v. Mancuso*, 42 F.3d 836, 846 (4th Cir. 1994).

[14] *United States v. Inv. Enters., Inc.*, 10 F.3d 263, 269 (5th Cir. 1993); *United States v. Sanchez-Robles*, 927 F.2d 1070, 1073 (9th Cir. 1991).

(D.C. Cir. 2002); *see* FED. R. CRIM. P. 30(d); FED. R. CRIM. P. 52(b). Given the state of the law in this circuit, and in the other courts of appeals, any error – if there was one – could hardly be considered plain. *See United States v. Olano*, 507 U.S. 725, 732-34 (1993).

As to the factual predicate for the instruction, we agree with Alston-Graves that there was none. Some courts hold that a willful blindness instruction should not be given unless there is evidence that the defendant "purposely contrived to avoid learning all the facts in order to have a defense in the event of a subsequent prosecution." *United States v. Espinoza*, 244 F.3d 1234, 1242 (10th Cir. 2001) (quoting *United States v. Hanzlicek*, 187 F.3d 1228, 1233 (10th Cir. 1999)) (internal quotation mark omitted); *accord United States v. Heredia*, 429 F.3d 820, 824 (9th Cir. 2005); *United States v. Puche*, 350 F.3d 1137, 1149 (11th Cir. 2003); *United States v. Willis*, 277 F.3d 1026, 1032 (8th Cir. 2002). Other circuits hold that there must be evidence "that [the defendant] was aware of a high probability [of the fact in dispute] and consciously avoided confirming that fact." *United States v. Ferrarini*, 219 F.3d 145, 154 (2d Cir. 2000) (quoting *United States v. Rodriguez*, 938 F.2d 455, 458 (2d Cir. 1993)) (alterations in original; internal quotation mark omitted); *accord United States v. Freeman*, No. 04-30037, 2005 WL 3525612, at *5-6 (5th Cir. Dec. 23, 2005). There are other variations, *see, e.g.*, *supra* note 5, but none of them remotely justified giving a willful blindness instruction in this case, *see Ferrarini*, 219 F.3d at 157-58.

The only instance of deliberate ignorance or willful blindness the prosecutor cited in his closing argument concerned Alston-Graves's initial refusal to accept documents from Anselma, the finance company officer, who wanted to fax them to her because he suspected the signatures of "Lois Austin" were forged. The district court also relied on this incident in granting

the prosecution's request to give the instruction.  We cannot understand how Alston-Graves engaged in deliberate ignorance in this exchange with Anselma.  She was posing as Lois Austin at the time and she, above anyone else, would have known whether she had signed the documents or not.  Far from feigning ignorance, she told Anselma that the signatures were hers.  And when he did fax the documents to her, Alston-Graves confirmed again that she had signed "Lois Austin" on the documents.  Her conduct of course was criminal, regardless whether she signed the documents or not.  The documents were phony and not just because she was using a phony name.  But the point is that nothing in her actions amounted to an attempt to remain ignorant of some fact bearing on the criminality of her endeavors.[15]

To illustrate, suppose an individual is driving someone else's vehicle and suppose the vehicle has a hidden compartment containing drugs.  No one would say that the driver engaged in deliberate ignorance when, in response to the owner's invitation to see what is in the hidden compartment, the driver replies that he does not need to look inside because he put the drugs in there himself.  That is exactly the situation here with respect to the Lois Austin signatures Anselma wanted Alston-Graves to examine for authenticity.

For many of the reasons just stated, the error in giving the willful blindness instruction was harmless.  The incident

---

[15] Some courts hold that a willful blindness instruction may be given even though there is sufficient evidence that the defendant acted knowingly.  *See, e.g.*, *United States v. Wert-Ruiz*, 228 F.3d 250, 257 (3d Cir. 2000) ("[B]ecause the jury could selectively discredit some of the evidence in the prosecution's case, the existence of evidence that points to actual knowledge does not preclude consideration of other evidence that points to a finding that [the defendant] was wilfully blind . . ..").

involving the signatures was of minor significance compared to the rest of the prosecution's evidence. No reasonable juror would have treated that incident in the manner the instruction permitted; there was no factual basis for viewing her conduct as conscious avoidance. The balance of the evidence against Alston-Graves was untouched by the instruction, and, as we have said, that evidence showed beyond doubt that she committed the offenses for which the jury found her guilty. Just like other errors that occur at trial, erroneous instructions – even unconstitutional instructions, which this is not – can be harmless. *See, e.g.*, *Rose v. Clark*, 478 U.S. 570, 579-80 (1986); *United States v. Carney*, 387 F.3d 436, 449 (6th Cir. 2004) ("[E]ven a legally-erroneous jury charge will not justify reversal of a conviction if its probable effect on the verdict was inconsequential."); *United States v. Wells*, 262 F.3d 455, 466 (5th Cir. 2001) ("[E]rror in giving the deliberate ignorance instruction is . . . harmless where there is substantial evidence of actual knowledge.") (second alteration in original; internal quotation marks and citation omitted); *accord Ferrarini*, 219 F.3d at 157; *United States v. Whittington*, 26 F.3d 456, 464 (4th Cir. 1994).

## III.

Operating in the period between *Blakely v. Washington*, 542 U.S. 296 (2004), and *United States v. Booker*, 125 S. Ct. 738 (2005), the district court concluded that as a consequence of *Blakely*, the mandatory regime of the U.S. Sentencing Guidelines was invalid. The court therefore considered the guidelines "helpful and instructive" and imposed a discretionary sentence. In its factual findings based on a preponderance of the evidence, the court concluded that the loss amount for sentencing purposes was "in the neighborhood of just shy of $800,000." On that basis, the court enhanced Alston-Graves's base offense level from 6 to 17. The court further increased the

offense level by four levels – adding two for more-than-minimal planning and two for misrepresenting that she acted on behalf of a government agency – making a total level of 21. Based on a criminal history category of I, the court determined the applicable Guidelines range to be 37-46 months. Nevertheless, the court in its discretion imposed a prison sentence of 27 months. The defense urged the court to discard the Sentencing Guidelines's enhancement provisions and determine the range of sentence "solely on the basis of facts found by the jury beyond a reasonable doubt." Br. of Appellant 31. Had her argument prevailed, Alston-Graves claims her base offense level would have been 6, her criminal history category I, and the sentencing range 0-6 months because the jury did not make any specific factual findings.

After Alston-Graves's sentencing, the Supreme Court decided in *Booker* that the Sentencing Guidelines are now "effectively advisory," given the Sixth Amendment principles first articulated in *Apprendi v. New Jersey*, 530 U.S. 466 (2000). *Booker*, 125 S. Ct. at 757. Alston-Graves now argues that due process and ex post facto principles preclude application of the *Booker* remedy to her case because it deprives her of the full benefit of *Booker*'s Sixth Amendment holding. She makes this argument despite the Supreme Court's explicit instruction to apply both the Sixth Amendment and remedial holdings of *Booker* "to all cases on direct review." 125 S. Ct. at 769.

The due process claim, resting on ex post facto principles, can succeed only if Alston-Graves did not have fair warning of the potential punishment at the time of her conduct. *See Rogers v. Tennessee*, 532 U.S. 451, 459 (2001); *Bouie v. City of Columbia*, 378 U.S. 347, 355 (1964). Other courts of appeals have rejected arguments of this sort and we do the same. *E.g.*, *United States v. Jamison*, 416 F.3d 538, 539-40 (7th Cir. 2005) (citing cases); *accord United States v. Dupas*, 417 F.3d 1064,

1068-69 (9th Cir. 2005); *United States v. Duncan*, 400 F.3d 1297, 1306-08 (11th Cir. 2005). In 1997 and 1998, when Alston-Graves engaged in criminal conduct, anyone committing wire fraud and conspiracy was subject to the statutory maximum sentence of five years for each crime. 18 U.S.C. §§ 371, 1343 (1994); *see id.* § 3551 *et seq.*; *Duncan*, 400 F.3d at 1307. In a case like this one, in which the sentence imposed falls within both the statutory maximum and the Guidelines range, a defendant cannot reasonably claim unfair notice of potential punishment. *See United States v. Vaughn*, 430 F.3d 518, 524-25 (2d Cir. 2005); *United States v. Lata*, 415 F.3d 107, 112 (1st Cir. 2005). Alston-Graves therefore had ample warning of the potential sentence that could be imposed when she committed her crimes and had no reason to expect a lesser sentence. *Cf. Dobbert v. Florida*, 432 U.S. 282, 297-98 (1977) ("[T]he existence of the statute served as an 'operative fact' to warn the petitioner of the penalty which Florida would seek to impose on him if he were convicted . . .. This was sufficient compliance with the ex post facto provision of the United States Constitution."). *Marks v. United States*, 430 U.S. 188 (1977), on which Alston-Graves relies, is not to the contrary. *See id.* at 196-97. Her due process rights were not violated.

We therefore hold that by giving the jury the willful blindness instruction the district court committed harmless error and that application of the remedial holding in *Booker* does not violate ex post facto principles of due process.

*Affirmed*.